

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-09-00095-CV
## NO. 02-09-00233-CV

IN THE ESTATE OF DORIS
ROSE PRESTON, DECEASED

------------

### FROM THE PROBATE COURT OF DENTON COUNTY

------------

## OPINION

------------

## I. INTRODUCTION

Doris Rose Preston died intestate in Denton County on August 27, 2005. After Appellant Scherry J. Levi filed an application for letters of administration in December 2005 seeking to be appointed administratrix of Doris's estate, three and a half years of what the trial court described as "extensive," "miserable," and "tortured" litigation followed. These appeals stem from a large part of that litigation, in which the trial court ultimately entered death penalty sanctions against both Scherry and Appellant Michael B. Preston.

In cause number 02-09-00095-CV, Scherry and Michael raise nine issues, challenging an amended final default judgment in favor of Appellee Deartis Preston. In cause number 02-09-00233-CV, Scherry and Michael raise eight issues, challenging a final judgment in favor of Stephen E. Dubner, successor administrator of the estate of Doris Rose Preston, and Western Surety Company.[1] We will modify the judgments in both causes and affirm the judgments as modified.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. People

Doris, Scherry, Michael, and Gwendolyn are siblings. Deartis is Gwendolyn's biological son, but Doris adopted Deartis sometime around 1985.[2] Deartis is the sole heir to Doris's estate. Gwendolyn has another child, Eva, Deartis's sister. Doris, Deartis, Eva, and Gwendolyn lived together in Denton County until Doris died in August 2005.[3]

### B. 2006 Pleadings and Proceedings

#### 1. Ad Litem Appointed

The trial court appointed Gretchen Benolken attorney ad litem and guardian ad litem of Deartis in January 2006. The estate matter was designated cause number PR-2005-00802.

---

[1]The portion of the final judgment in cause 02-09-00233-CV in favor of Doris's estate was assigned to Deartis. Deartis did not file a brief in either cause.

[2]Gwendolyn was "born retarded," and Deartis has a "retardation."
[2]Gwendolyn was "born retarded," and Deartis has a "retardation."

[3]According to Michael, Doris "took care of" Deartis, Gwendolyn, and Eva.

2

## 2.    March 13, 2006 Prove-up Hearing

On March 13, 2006, at the prove-up hearing on Scherry's December 2005 application for letters of administration, Scherry testified that at the time of Doris's death, she owned a house in Bay City, Texas (the Austin Street house); a 2004 vehicle; several bank accounts containing approximately $20,000; and a teacher retirement account.  According to Scherry, Doris also owned two certificate of deposit accounts—one worth approximately $79,000 and another worth approximately $49,000—that she had "entrusted" to Scherry and Michael "[t]o take care of Deartis . . . , to make sure that all of his medical things are taken care of, anything that he might need, you know, so that he'll be happy and comfortable the rest of his life."  When asked whether the accounts were "joint with right of survivorship or payable on death," Scherry responded, "All I know is that . . . the one that was in my name was placed in my name and the one that Michael's name was on was placed in his name because his name was on that one and my name was on the other one."  Scherry explained that her family had decided to relocate Deartis, Gwendolyn, and Eva to Bay City, where Scherry lived; that Eva had been acting as the primary caregiver for Deartis since Doris died and would continue in that role on a day-to-day basis; and that the funds in the accounts that Doris had allegedly entrusted to Scherry and Michael would be used for Deartis's benefit.  Michael, who lives in Los Angeles, testified that "[t]he moneys that were entrusted to me are entrusted to take care of our family.  That would be Eva, Gwen, Deartis . . . ."

3

At the conclusion of the hearing, the trial court expressed that it had questions about the status of the two accounts that Doris had allegedly entrusted to Scherry and Michael and that were now in their names. The trial court said,

> I'm trying to determine in my mind and I'm not so sure that it's clear in anybody's mind if these accounts were convenient accounts, were they beneficiary accounts, were they accounts like trust accounts for the use and benefit of Deartis or were they moneys given to her sister and brother?
>
> I believe the family is going to do what the family says, but I'm trying to determine: If that's part of the estate, I've got to bond it; if it's not part of the estate, then I'm not concerned about it.

Scherry's counsel responded that "if the bank transfers it into another person's name, it's probably based on a -- some kind of beneficiary or joint tenant with right of survivorship designation and we don't -- and that that would not be a probate asset." Benolken, however, stated that this was the first time that she had heard that those accounts existed and that she shared the trial court's concern about their status. The trial court signed an order authorizing letters of dependent administration that appointed Scherry administratrix of Doris's estate and set a bond at $100,000.

### 3. Amended Ad Litem Order

On March 22, 2006, the trial court signed an amended order appointing Benolken guardian ad litem and attorney ad litem of Deartis. The order provided that Benolken was "to be given access to all of DEARTIS PRESTON's financial, medical, psychological, and intellectual testing records."

4

### 4. April 12, 2006 Hearing—Motion to Reduce Bond

On April 12, 2006, the trial court held a hearing on Scherry's motion to reduce the bond. Scherry testified that she knew she was supposed to obtain a $100,000 bond but that she had not yet done so, that the two accounts that Doris had allegedly entrusted to her and Michael had each been held by Doris at First Bank, and that neither she nor Michael had withdrawn those funds from their respective accounts. Scherry specifically acknowledged that as the administratrix for the dependent administration of Doris's estate, all of her actions must be taken with court approval. In her closing argument, Benolken addressed the still-unanswered question about whether the funds in the two First Bank accounts were part of Doris's estate or whether they were properly paid to Scherry and Michael as non-probate assets, stating that "[t]here is no evidence that anyone has converted a penny. However, if the legal arguments that I have identified are correct . . . , just the fact that they've been paid over . . . could be a basis of a conversion claim." The trial court declined to reduce or increase the bond from $100,000. Western Surety Company later issued Scherry a bond in the amount of $100,000.

### 5. Amended Order Clarifying Benolken's Appointment

In July 2006, the trial court signed an agreed amended order clarifying Benolken's appointment and duties as the attorney and guardian ad litems of Deartis. Among other things, the order provided that Benolken had the power to

5

prosecute ancillary proceedings "to effectuate the protection of Deartis Preston and his rights, claims and assets" and that Benolken

> is to be given access to and shall review all records of Doris Preston's assets and/or liabilities and/or those of her Estate, including, but not limited to copies of signature cards, controlling agreements, and all records regarding Doris Preston's banking and investment accounts of any nature, and that any and all relatives of Doris Preston and any [] and all financial institutions in which she maintained any such assets hereby are ORDERED to produce such records to [Benolken] at her request.

### 6.     Inventory and Appraisement

Scherry filed an inventory, appraisement, and list of claims on November 1, 2006, almost a year after she filed her application for letters of administration. The filing listed the total value of Deartis's property at the time of her death at $67,242.86. It did not, however, include values for the two First Bank accounts that Doris had allegedly entrusted to Scherry and Michael.

### 7.     New Guardian Ad Litem and Power of Attorney

In November 2006, the trial court appointed Angela Miller guardian ad litem for Deartis. Benolken remained Deartis's attorney ad litem through the pendency of the litigation. At a hearing on a motion for instructions, Scherry disclosed for the first time that she had obtained a power of attorney for Deartis with the help of an attorney who was located in Bay City and who had no other connection to this case.[4]

---

[4]Scherry testified that she obtained the power of attorney so that she could receive funds from Doris's teacher retirement account.

6

### 8.	Complaint Regarding Production of Documents

On November 13, 2006, Benolken filed a "Complaint Requesting Additional Inventory and Imposition of Constructive Trust" on behalf of Deartis. The complaint stated that Scherry had not turned over financial information regarding the assets of Doris's estate and that there was concern about the inventory and appraisement that Scherry had filed because it omitted the two First Bank certificate of deposit accounts that were paid to Scherry and Michael.[5] Further, because "there have surfaced certain legal issues evidencing a bona fide dispute" regarding whether the First Bank "[a]ccounts were properly assets of the Estate as opposed to being disposed of by Decedent through non-testamentary dispositions to her brother and sister via joint accounts with right of survivorship and/or payable on death accounts," the complaint requested that the trial court impose a constructive trust on "any and all monies that were distributed" from the First Bank accounts "until such time as the Court can make a determination as to whether the monies in the [a]ccounts should be brought into the Estate because the account agreements do not contain the necessary elements required by Tex. Prob. Code §§439 and 439A."

### 9.	Motion to Compel

On December 8, 2006, Benolken filed a motion to compel on behalf of Deartis, stating that she had requested in writing financial information of Doris

---

[5]Benolken identified the accounts as ending in 0612 and 0433.

and Deartis but that she had "received absolutely nothing in response."[6]

Benolken prayed that the trial court order Scherry to respond to Benolken's requests for documents.

## C. 2007 Pleadings and Proceedings

### 1. Deartis's Original Petition

On January 19, 2007, Benolken filed an original petition (cause PR-2005-00802-01) on behalf of Deartis against Scherry and Michael, averring that Scherry and Michael had improperly received the funds from the First Bank accounts.[7] Deartis alleged claims for declaratory relief, constructive trust, and money had and received related to the funds.[8]

### 2. January 19, 2007 Hearing—Motion to Compel

On January 19, 2007, the trial court conducted a hearing on Deartis's motion to compel regarding Scherry's failure to produce documents. At the

---

[6]The requested information included "account information from January 1, 2005 through the present . . . regarding all checking, savings, money market, certificates of deposit, brokerage, stocks, bond, annuity or other accounts that Deartis Preston and/or Doris Preston has and/or had an ownership interest in and/or was a named owner."

[7]Deartis later filed several amended petitions.

[8]Benolken alleged in part that "the agreements, contracts, accounts, certificates of deposit, and signature cards do not comply with the requirements of Tex. Prob. Code §§439 and 439A"; "that the Accounts are not accounts with a valid right of survivorship and/or do not constitute valid payable on death accounts"; and "that the entirety of said Accounts are assets of the Estate of Doris Rose Preston."

8

outset of the hearing, the trial court questioned why Benolken's requests for documents had gone largely unanswered by Scherry,

> [T]he Court's duty is to see to it that that incapacitated heir receives whatever the incapacitated heir is supposed to receive, and usually that's through the efforts of -- of these ad litems. . . .
>
> . . . .
>
> . . . I'm at a point of some confusion, I admit. I'm at a point of some misunderstanding or -- or at least inability to understand why this process of reviewing the status of this estate and being certain that Deartis Preston, the incapacitated heir, is receiving what he's supposed to in a structure that's legally cognizable has turned into such a fight. I don't understand that.

Michael testified that he had a signature card and several financial documents regarding the disputed First Bank account that had been paid to him and that he would turn the documents over to his attorney. He said that of the approximately $72,000 that First Bank had transferred to him, about $30,000 had already been used for a down payment on a house that was purchased in Bay City (the Sailfish house) for Deartis, Gwendolyn, and Eva.[9] Michael said that the Sailfish house was titled in both Scherry's and Deartis's names. Further, of the $72,000, another $5,000 each was paid to Scherry and Artis (another Preston sibling) to pay for attorneys' fees. Michael opined that about $52,000 had been spent from the First Bank account. In terms of handling Doris's estate matters, caring for Deartis, and turning over documents, Michael agreed with the trial

---

[9]Deartis, Gwendolyn, and Eva moved into the house.

9

court that his family had "informal or extralegal kind[s] of arrangements and these are based on -- on a moral obligation between family members."

Scherry testified that title to the Sailfish house was partly in her name because Deartis had no credit in his name, and she agreed to turn over certain bank statements, financial documents, and closing documents that were in her possession. Scherry testified that she had not spent any of the funds that Doris had left her in the First Bank account.

At the conclusion of the hearing, the trial court stated that the issue of whether the funds in the First Bank accounts were nonprobate assets belonging to Scherry and Michael "must be resolved." Regarding how Scherry and Michael were handling matters related to Doris's estate, including responding to discovery requests and turning over documents, the trial court stated the following:

> And I realize that [Michael] and [Scherry] have both made it clear to the Court that these long-standing, tradition-based family obligations that they have undertaken are very serious to them and that they believe they should live up to those obligations and live under those obligations and follow them in the interest of Deartis, and I respect that. I respect that. However, it lacks legal cognizability and structure, and the Court's duty -- no matter what the family's legal and ethical and moral undertakings are, it is the Court's duty to see that the incapacitated heir is protected not just morally and ethically, as I believe is certainly happening with this family, but also legally.

### 3. January 25, 2007 Hearing—Motion to Compel

On January 25, 2007, the trial court continued the hearing on Deartis's motion to compel but granted Scherry's motion for a continuance on the matter. Scherry's attorney stated that neither Scherry nor Michael had given him any of

10

the documents referenced in the January 19, 2007 hearing, and he agreed with the trial court's assessment that Scherry had "different ideas about the need for a structured arrangement in the handling of this matter for the incapacitated heir" and that, in her opinion, "the informal family arrangements based on moral and ethical obligations" should "be unfettered by the . . . unnecessary intrusions of the law." The trial court stated that Scherry's and Michael's familial arrangements to address Doris's estate and to "take care of Deartis" were "foreign arrangements to the legal system. While they may very well be based on bona fide moral, ethical family ties and connections, they have no enforceability associated with them, and the Court has to require the administration of an estate in accordance with the law." The trial court opined that in light of Benolken's continuing difficulty in obtaining documents, "by the time these ad litems get through protecting Deartis, Deartis won't have anything to protect, . . . so this is a difficult and untenable situation."

### 4. Original Answer and Third Party Claim

In early February 2007, Scherry and Michael filed their original answer and a third party claim against First Bank in the action filed by Deartis. They alleged that they were entitled to be indemnified by First Bank if the funds in the disputed accounts did not belong to them.

### 5. Order Granting Motion to Compel

On February 23, 2007, the trial court signed an order granting Deartis's motion to compel. The order stated that Scherry had "wholly failed to respond to [Benolken's] requests for documents as ordered to be made available to [Benolken] by Order of this Court dated July 17, 2006," and it required both Scherry and Michael to "produce all documents responsive to Ad Litem's request for documents." The order also required Scherry and Michael to "preserve the status quo as to all assets" that are part of Doris's estate and that are the subject of the ancillary lawsuit filed by Deartis against Scherry and Michael.

### 6. March 1, 2007 Hearing

At a hearing on March 1, 2007, Benolken acknowledged that Scherry's attorney had given her a "stack of documents" that Scherry and Michael had produced but that Scherry and Michael had still not turned over the documents detailed by the July 17, 2006 order. Scherry testified briefly that she had given "what [she] had" to Benolken. The trial court mentioned that Miller had filed an application for guardianship for Deartis.

### 7. Second Order Granting Motion to Compel

On March 14, 2007, the trial court signed a second order granting Deartis's motion to compel. The trial court found that Scherry had failed to respond to Benolken's requests for documents as ordered by the trial court on July 17, 2006, and on February 23, 2007, and it required Scherry and Michael to produce all

12

originals and copies of documents pertinent to Doris's estate case and Deartis's suit against Scherry and Michael. The order set a hearing for April 19, 2007, to show cause whether Scherry had complied with the order and, if she had not, to determine whether she should be held in contempt of court.

### 8.    April 19, 2007 Hearing—Show Cause

Benolken called Miller to testify about the noncompliance with the trial court's orders. Miller testified that although certain documents had been turned over, Scherry had not complied with the July 2006 agreed amended order clarifying Benolken's appointment; the February 23, 2007 order on motion to compel; and the March 14, 2007 second order on motion to compel. Regarding the Sailfish house, Miller testified that Scherry had turned over only the front page of the warranty deed, had not turned over the entire "closing packet" from the title company, and had not turned over the note or any of the financing documents. As for Doris's bank statements, Scherry had turned over some handwritten "summaries" instead of the actual statements or copies thereof. Miller opined that Scherry had not turned over "sufficient detail" of Doris's teacher retirement account and had not produced "information concerning disability benefits." Miller also opined that it was not possible to determine what monies of Doris's estate had been spent or to analyze Deartis's personal money based on the documents that had been turned over. Miller testified that Scherry was the person with control over all of the records that were in Doris's house. On

13

rebuttal, Miller recalled that Scherry did not want to permit Benolken to review all of the requested documents at Scherry's attorney's office because it would "cost thousands of dollars."

Scherry testified that she had produced the documents that were in her possession, that she had "sent the documents that [she] thought [Benolken] wanted," and that no records regarding Doris's teacher retirement account had been given to her, but she admitted that she had not produced all relevant bank statements and banking records for Deartis, that only part of the documents regarding the Sailfish house had been produced, that she had not produced an Atlanta Life Insurance policy, that she had not turned over documents relating to Deartis's Social Security benefits, and that she had not permitted Benolken to see any original documents. Scherry also testified that she had used estate funds to pay for a storage space and that she had spent $13,000 of the funds from the First Bank account to pay off Doris's car. There was no evidence that Scherry had obtained the trial court's permission to spend estate money.

At one point during the hearing, the trial court acknowledged that Michael had "no personal duty or obligation to be before" the trial court because he was not the administrator and was not an applicant for guardianship. The trial court then stated,

> I only need to concern myself, as far as [Michael] is concerned, with whether or not he is agreeable to submit himself to the jurisdiction of the court for the purpose of the Court's asking him to provide documents and checkbooks and other matters that he

14

may have, if he has any, that relate in any way to the Doris Rose Preston or Deartis Preston business. That's all I need to know.

Michael testified that he understood that he was a defendant in the ancillary suit filed by Deartis against him and Scherry but that he was only a witness in Doris's estate case. He submitted to the jurisdiction of the trial court, stated that Scherry's attorney also represented him, and, to the extent that he had not already done so, agreed to turn over documents in his possession that were responsive to Benolken's requests. Michael confirmed that much of the money that was transferred to him from the disputed First Bank account had been spent on attorney's fees and on the Sailfish house.

Before recessing the hearing, the trial court stated that it was concerned about the "ongoing track that the case is on" due to the "continuing, almost incredibly frustrating, maddening document situation that's going on at this time." According to the trial court, "because [Scherry] indicated she fails to understand the scope of the discovery orders or the orders to compel or she reaches her own conclusions about what she's supposed to produce, . . . the ad litems don't have enough information and nobody can go forward."

### 9.    April 23, 2007 Hearing—Show Cause

At the outset of the hearing, the trial court once again explained its frustration with the case after mentioning that it disagreed with Scherry's prior testimony that she could not take any action in regard to Doris's teacher retirement account until the probate matter had closed,

15

And as I stated in my rendition on Thursday, this is a particularly frustrating case to the Court because much, much expense has been incurred, and much delay has . . . occurred in this case. Largely, it appears there[] still, today, even this late in the case, remains a fundamental either recalcitrance and refusal or complete lack of understanding as to the scope of the obligation of the administratrix and/or applicants in the guardianship case to produce documents and records, regardless of what the position is of the party or what the party believes about the legal status of those documents and whether the party believes something is relevant or not. This is very frustrating for the Court . . . .

Benolken testified in the narrative that estate funds were being improperly spent without court approval, that "items that are normally handled through the estate process [were] being handled in a totally different fashion out of other accounts," and that Doris's estate funds were being "dissipated as the sole and proximate result of [Scherry's] continued refusal" to fully comply with the trial court's orders. In addressing the Sailfish house documents, Benolken said that it looked like Scherry had signed Deartis's name—without any authority—on one of two versions of the sales contract for the Sailfish house that were in evidence.[10] Benolken thoroughly reviewed the various shortcomings of Scherry's and Michael's compliance with the trial court's orders,[11] explained how she thought

---

[10]Benolken also opined that Deartis would be "on the hook under the deed of trust" if Scherry did "not comply with the terms of the note," which only she signed.

[11]Benolken testified in part that Michael had charged the estate $2,000 for travel expenses without the trial court's approval.

16

Scherry had violated her fiduciary duty as administratrix of Doris's estate,[12] and urged that Scherry be removed as administratrix as a sanction.

The trial court made the following findings at the conclusion of the show cause hearing:

> I concur with the position of the attorney ad litem that [Scherry] has been given multiple opportunities by this court to simply comply with document discovery. She has repeatedly made her own decisions about what she thinks is relevant. She has continually reiterated untenable positions regarding document production. And while she continues to insist that she's given Ms. Benolken everything, sometimes more than once, her performance of the document production has been highly selective, extremely inadequate.
>
> . . . [T]he Court determines from that evidence, [that Scherry] has not even cooperated with her own counsel in connection with that matter and has made her own decisions about what documents to make available to him, based on erroneous and irrelevant consideration, such as whether or not it would, in her judgment, increase expenses in the case to provide the documents to her counsel which have been previously ordered.
>
> The Court has been very, very patient. The Court has executed more than one order. The Court has allowed a lot of time. The Court has tried the method of placing the administratrix in a noncourt record environment with the ad litem counsel and her own counsel in an attempt to secure simple, straightforward document production requests.
>
> . . . .
>
> It's clear that the administratrix has no notion that she needs to secure court approval for anything, despite repeated instructions by the Court and, actually, in open court by ad litem counsel and others. It is clear that she is not informing her own counsel of

---

[12]Benolken noted Scherry's (1) placing the Sailfish house in both her name and Deartis's name, (2) accepting money from Michael out of one of the disputed accounts, and (3) obtaining a power of attorney from Deartis.

actions that she's taking. The purchase of the house was without court approval. Whether it was deemed by her to be in the best interest of the ward, Deartis Preston, or not, she is simply thumbing her nose at the jurisdiction of the court.

. . . .

[Scherry] has withheld documents, made her own determinations about documents, [and] offered very irrelevant and, in fact, almost insulting excuses, such as the copy machine didn't work correctly or some other avoidance technique . . . .

The trial court then found Scherry in "constructive contempt" of court and gave her an opportunity to "cure" this by producing the requested documents in their original form. The court suspended Scherry's power of attorney and stated that it "will have under advisement the possibility of the following sanctions: Removal of [Scherry] as . . . dependent administratrix . . . and [the] striking of her pleadings."

### 10. May 7, 2007 Order on Show Cause

On May 7, 2007, the trial court signed its order on show cause, detailing the findings set out orally at the April 23, 2007 hearing and numerous additional findings and conclusions, including the following findings regarding Michael:

11. To the extent there was a deficiency in any notice on any matters heard by the Court, [Michael] waived notice by his appearance and participation without objection and voluntarily subjected himself to the jurisdiction of the Court.

12. Despite being placed on adequate notice of the contested nature of the accounts on which [Michael's] name appears in addition to [Doris's], as well as this Court's previous order regarding preserving the *status quo* of such account, [Michael] has testified that he has unilaterally expended large portions of the $70,000 that was contained in such alleged survivorship account, under his own

18

belief and idea that it was his money . . . . [Michael] has failed to abide by this Court's directives as to him.

The trial court adjudged both Scherry and Michael in constructive contempt of court and gave them the opportunity to "purge" their contempt by producing all of the requested documents to Benolken by May 18, 2007. The trial court also decreed the following regarding sanctions:

[T]he Court hereby takes under advisement imposing the harshest available sanctions, including but not limited to[,] striking the pleadings of [Scherry] and/or [Michael] in cause number PR-2005-00802, GS-2007-00162, and all ancillary proceedings that were or could have been filed in connection therewith, including, but not limited to, PR-2005-00802-01 and all other matters ancillary to the core proceeding, and impos[ing] all other available death penalty sanctions . . . .

### 11.    May 7, 2007 Order on Status Conference

On May 7, 2007, the trial court signed an order on status conference decreeing, among other things, "that [Michael] has submitted to the jurisdiction of this Court and is a party to this and all related proceedings."

### 12.    May 9, 2007 Order Granting Application for Temporary Injunction

On May 9, 2007, the trial court granted an injunction prohibiting Scherry and Michael from using any of Deartis's property, including the funds in the disputed First Bank accounts.

### 13.    June 13, 2007 Hearing

On June 13, 2007, the trial court held the first of a number of hearings in which it considered whether Scherry and Michael had successfully purged their

19

constructive contempt set out in the May 7, 2007 order on show cause. Additional documents were not turned over until June 4, 2007—after the May 18, 2007 deadline—but the trial court excused the tardiness and limited its inquiry to whether Scherry and Michael had complied with the May 7, 2007 order on show cause by producing all of the requested documents.[13]

Scherry testified that she had received a copy of the show cause order, that she had read the order, and that she had received a copy of the transcript of the April 23, 2007 hearing. Nonetheless, she testified that she had not produced documents relating to Doris's car, which the estate owned and which Scherry had paid off without obtaining the trial court's permission to do so; that she had allowed Eva to drive Doris's car without paying for its use even though Deartis paid for its insurance; that she had used money from Deartis's representative payee account to pay taxes on the Austin Street house; that she had used estate money to pay filing fees in Deartis's guardianship case; that she had deposited a royalty check into an account that she held with Doris and that was also in Doris's name when she died; that she had used money from Deartis's representative payee account to pay taxes on land owned by the family in Cherokee County; that she had produced certain banking records regarding Doris's bank accounts but had not requested the rest of the records from the banks; that she had never deposited a royalty payment for Doris into the estate

---

[13]The record shows that a number of deposits were made into the trial court's registry around this time.

account; that she had never produced any of Doris's bills from Atmos Energy or Sears; that she had accepted a check from Michael's disputed First Bank account in the amount of $11,000 as payment for her services as administratrix; that she had not listed Doris's royalty interest in the inventory and appraisement that she filed; and that she had deposited Doris's tax refund in Deartis's representative payee account instead of Doris's estate account. Scherry admitted that there were more documents relating to Doris's estate that she had not produced. The trial court recessed the hearing.

### 14. June 14, 2007 Hearing

The trial court held a hearing on June 14, 2007, primarily to address scheduling matters. At the conclusion of the hearing, it sua sponte removed Scherry as administratrix of Doris's estate and appointed Dubner successor dependent administrator. The trial court reasoned,

> It is apparent to me that [Scherry], although repetitively admonished, held in contempt, placed in an opportunity to purge the contempt, still does not take seriously or understand or -- either that or refuses to accept, I don't know which, the obligations of a court-appointed fiduciary.
>
> . . . .
>
> I cannot in good conscience -- in fact, it would be, I think, bordering on neglect to do so, to leave [Scherry] in the position of court-appointed administratrix, given the uncontroverted evidence before the Court at this time, which is the method by which the house and the parties live in was acquired, the title that it's held in, the complete lack of understanding, as demonstrated by the closing, the action to have a local attorney provide a power of attorney and have Deartis Preston execute documents, when it was clear and should have -- either was known or should have been known to all

21

parties that he's an incapacitated person and should never have been put in that position.

The failure to account for funds, the commingling of funds, and the use of funds for the multiple benefit of other parties is all uncontroverted before the Court. The failure to account for income, such as oil and gas royalty, the failure to produce or place money in the registry of the court until ordered to do so or until extreme actions were taken, all dictate to this Court that the level of -- lack of performance, the level of violation, the level of disregard or misunderstanding -- it doesn't really matter which, because it has the same effect -- expressed or -- I'm sorry not expressed -- demonstrated by [Scherry], necessitates her immediate removal.

### 15. Dubner's Original Petition in Intervention

Dubner, as successor dependent administrator of Doris's estate, filed an original petition on July 20, 2007, intervening in the lawsuit filed by Deartis against Scherry and Michael. He alleged a claim for breach of fiduciary duty against Scherry only and claims for conversion and for recovery of the funds in the disputed First Bank accounts pursuant to probate code section 442 against both Scherry and Michael. Dubner later sued Western Surety, the surety on the bond filed by Scherry, alleging that it was liable for the wrongful conduct of Scherry.[14]

### 16. July 30, 2007 Hearing

On July 30, 2007, the trial court continued the hearing regarding whether Scherry and Michael had purged their constructive contempt. Scherry testified that she had not produced Doris's tax returns, all of Doris's banking records and

---

[14]Western Surety later settled Dubner's claims against it for $85,000.

22

statements, an Atlanta Life policy, various invoices from creditors (such as Sears and Foley's), and the signature cards for Doris's undisputed bank accounts. Scherry testified that she had canceled the insurance on the Austin Street house; that she had used estate funds to purchase a replacement refrigerator for the Austin Street house; and that she had never collected rent from her son, who was living at the Austin Street house when Doris died.[15]  Scherry also admitted that even though she had testified in the past that the certificates of deposit left by Doris were to be used for Deartis's benefit, she had designated her children beneficiaries of a certificate of deposit that was created using funds from a certificate of deposit account that Doris owned when she died and that was left in Scherry's or Michael's name.  The trial court recessed the hearing.

### 17.    July 31, 2007 Hearing

At the July 31, 2007 hearing, Scherry testified that Doris had received royalty payments after Doris died and that the payments were deposited into a "house" account in Scherry's and Doris's name but that Scherry had never repaid the royalty payments back to the estate.  Scherry stated that the 2006 taxes on the Austin Street house had not been paid even though she could have paid them in her capacity as administratrix.  She also admitted that she had received payments from Michael from one of the disputed First Bank accounts after

---

[15]The trial court had granted Scherry's application to authorize the demolition of the Austin Street house back in July 2006, but Scherry never had the house demolished.

23

February 23, 2007, (the date the trial court signed the order on Deartis's motion to compel) and that there were still documents in her possession pertaining to Doris's estate that she had not produced. The trial court recessed the hearing.

### 18. August 1, 2007 Hearing

At an August 1, 2007 hearing, attorneys questioned Scherry more about the Sailfish house, bank accounts, and her failure to produce documents. She gave the following explanation for her failure to timely produce documents relevant to Benolken's requests:

> More than one time I've been asked for different things, but let me start at the very front. As I've said before, I was not actually aware of some of the things that I have that I should have sent. I did not think that she would need an accident policy. Doris did not die of an accident, and there was no money to be collected on that policy. She didn't have any life policies other than the one, and I'm not sure that I sent it or I didn't.
>
> . . . .
>
> She had different banks, and she had the insurances. She had the CDs and she had all of this stuff that has to be arranged to keep up with. So I tried to make sure that those things were made available because I knew they were important, you know, the things -- the bank situations. I don't know how I forgot the Hibernia account. Perhaps we were not really using that account, and she had so many up here that -- that it just did not cross my mind to send it.
>
> I had no reason to hide it. I just didn't think to send it. We weren't spending anything out of it. . . .
>
> Then when they [presumably Deartis, Gwendolyn, and Eva] moved down there, I had three houses to be -- contend with. I had many reports to be sent in. I -- sometimes the timing was not long enough. . . .

24

I did not really understand accounting, and I was trying to get myself organized so that when we sent it -- because I did not realize it was long past due. . . .

The trial court recessed the hearing.

### 19.     September 18, 2007 Hearing

At a hearing on September 18, 2007, Scherry testified that she had received checks from Michael that were drawn on a disputed First Bank account even though she knew the trial court had ordered that no more funds were to be expended from the disputed accounts.  And as in a previous hearing, Scherry agreed that when she renewed the disputed certificate of deposit account that Doris had allegedly entrusted to her, she did not designate Deartis as its beneficiary.

Michael testified that he had been "integrally" involved in the litigation since it began; that he understood that the order on show cause required him to produce documents; that he wrote checks using funds from a disputed First Bank account after the trial court ordered him and Scherry to preserve the status quo as to "all assets"; and that he had agreed at an earlier hearing that he was making an appearance before the trial court in all matters and submitting to the trial court's jurisdiction.  Michael further testified that he thought compliance with the order on show cause was voluntary, that the funds spent from the disputed First Bank account were used for family, and that the Sailfish house was purchased because Deartis, Gwendolyn, and Eva needed a home.  The trial court recessed the hearing.

### 20. Deartis's Motion for Sanctions

On October 19, 2007, Deartis filed a motion for sanctions against Scherry and Michael in the PR-2005-00802-01 cause (Deartis's suit against Scherry and Michael). The motion stated that it was "filed out of an abundance of caution[] and not in lieu of any other relief requested in this case. . . . Ad Litems request the Court to take affirmative action and implement the proposed sanctions which this Court previously has taken under advisement in this case." Deartis outlined Scherry's and Michael's alleged sanctionable conduct—the refusal to provide discovery, to render an accounting, and to obey the trial court's orders—and requested, among other things, that the trial court enter death penalty sanctions against Scherry and Michael, including, but not limited to, striking their pleadings in the PR-2005-00802-01 cause and entering a default judgment against them. Dubner adopted the position asserted by Benolken in Deartis's motion for sanctions.

### 21. October 26, 2007 Hearing and December 3, 2007 Closing Arguments

On October 26, 2007, the trial court convened the final evidentiary hearing regarding whether Scherry and Michael had successfully purged their constructive contempt. The trial court granted Benolken a "trial amendment" to clarify that Deartis's motion for sanctions applied retroactively,[16] and Michael

---

[16]Benolken, Miller, Dubner, and counsel for Scherry and Michael signed the following stipulation:

26

confirmed that the order on show cause applied to him. The parties rested and closed at the conclusion of the hearing, and the trial court heard closing arguments at a hearing on December 3, 2007.

## D. 2008 Pleadings and Proceedings

### 1. Consolidated Order on Motions to Compel and For Sanctions and Show Cause

On March 4, 2008, the trial court signed a consolidated order on motions to compel and for sanctions and show cause, granting Deartis's motion to compel and Deartis's and Dubner's motions for sanctions, holding Scherry and Michael in constructive contempt of court for failing to comply with numerous orders, setting out in detail Scherry's and Michael's acts and omissions underlying the order, and imposing death penalty sanctions against both of them. The order stated in part,

> [T]he Court hereby strikes all of the pleadings of [Scherry] and [Michael] in cause number PR-2005-00802, GS-2007-00162, and all ancillary proceedings that were or could have been filed in connection therewith, including, but not limited to, PR-2005-00802-01 and all other matters ancillary to the core proceeding, and imposes all other available death penalty sanctions, including, but

---

[A]ll prior testimony and documentary evidence obtained and admitted in all prior hearings in this cause (PR-2005-00802-01), in Estate Case No. PR-2005-00802, and in Guardianship Case No. GS-2007-00162, together with all orders entered in each of the foregoing causes, are admitted conclusively as evidence to be considered and used for all purposes with regard to all matters which have been noticed and/or set for hearing in this cause, whether as a continuation of any prior hearing(s) or as an initial hearing, on October 26, 2007, and any continued or related hearing or trial thereafter.

27

not limited to, precluding [Scherry] and/or [Michael] (i) from acting as Dependent Administrator/rix, (ii) from being appointed as Guardian of the Person and/or the Estate of Deartis Preston, (iii) from acting as agent-in-fact for Deartis Preston, (iv) from pursuing claims that have been brought or could have been brought in any of the Related Cases and/or any further ancillary matters thereto, (v) from defending claims that have been brought or could have been brought in the Related Cases and/or any further ancillary matter thereto, (vi) from offering or eliciting any evidence or defenses relating to the causes of action that were or could have been asserted against him or her by Attorney Ad Litem or Guardian Ad Litem or Successor Dependent Administrator in any of the Related Cases and/or any further ancillary matters thereto; (vii) from opposing or interposing any objections concerning any and all evidence of damages against them, (viii) from being entitled to obtain responses to any pending discovery requests from Deartis Preston, Ad Litems and/or Successor Dependent Administrator, and (ix) hereby awarding judgment by default on liability in favor of Deartis Preston and the Estate of Doris Rose Preston as against [Scherry] and [Michael] . . . .

### 2.       Post-Death Penalty Sanctions Hearings

The trial court convened hearings on June 19, 2008; August 21, 2008; and August 22, 2008, on Benolken's, Miller's, and Dubner's then-pending applications for attorneys' fees.  After ruling on the applications, the trial court convened hearings on August 22, 2008; September 12, 2008; and December 11, 2008, to allow Benolken and Dubner to prove up damages, including exemplary damages, in their suits on behalf of Deartis and the estate against Scherry and Michael (cause PR-2005-00802-01).

28

### 3.    Order of Severance

On December 11, 2008, the trial court signed an order severing the default judgment and all claims and issues of Deartis against Scherry and Michael from cause PR-2005-00802-01.  The trial court assigned cause PR-2005-00802-02 to Deartis's case.

### E.    2009 Proceedings

#### 1.    Amended Final Default Judgment—PR-2005-00802-02

On January 8, 2009, the trial court signed an amended final default judgment in favor of Deartis against Scherry and Michael.[17]    The order (1) awarded the Sailfish house to Deartis free and clear of any and all liens, claims, and encumbrances (except for claims of "governmental taxing authorities" and an equitable lien granted by the separate judgment in favor of Doris's estate); (2) enjoined any and all persons and entities from "[u]ndertaking any actions which would endanger the Sailfish [h]ouse in any way"; (3) declared the Sailfish house Deartis's sole and separate property; (4) awarded Deartis "actual damages" in the amount of $127,000; (5) awarded Deartis exemplary damages in the amount of $414,000; and (6) awarded Deartis prejudgment and postjudgment interest.  The trial court signed its findings of fact and conclusions of law on January 28, 2009.

---

[17]This is the judgment that Scherry and Michael appeal from in appellate cause 02-09-00095-CV.

29

## 2. Final Judgment—PR-2005-00802-01

On April 13, 2009, the trial court signed a final judgment in favor of Dubner, as successor administrator of Doris's estate, and Western Surety against Scherry and Michael.[18] Regarding Dubner's claims against Scherry under probate code section 442, the trial court awarded Doris's estate $13,023.70.[19] On Dubner's claims against both Michael and Scherry under probate code section 442, the trial court awarded Doris's estate $83,635.10.[20] The trial court additionally awarded Doris's estate exemplary damages in the amount of $180,716.94; an equitable lien on the Sailfish house in the amount of $25,070.34 "to secure payment of the funds from account referenced above ending in 612"; and "attorney's fees and expenses" against Scherry in the amounts of (1) $29,125.45 "for attorney's fees and expenses of [Dubner] that would not have otherwise been incurred except for the actions and/or inactions of" Scherry, (2) $53,186.62 "for fees and expenses incurred by [Miller] that would not have otherwise been incurred except for the actions and/or inactions of" Scherry, and (3) $174,067.00 "for fees and expenses incurred by [Benolken] that would not have otherwise been incurred except for the actions and/or inactions of" Scherry. Of the

---

[18]This is the judgment that Scherry and Michael appeal from in appellate cause 02-09-00233-CV.

[19]This figure consists of damages in the amount of $92,213.73 less a credit of $80,383.93 plus prejudgment interest of $848.90.

[20]This figure consists of damages in the amount of $78,368.14 less a credit of $184.47 plus prejudgment interest of $5,451.42.

30

judgment awarded to Doris's estate against Michael, $85,000 was assigned to Western Surety. On May 11, 2009, the trial court signed an order that assigned the portion of the final judgment in favor of Doris's estate to Deartis.

The judgment awarded Western Surety $85,000 on its indemnity claim against Scherry plus attorneys' fees and expenses in the amount of $38,408.63.[21] The trial court adopted Dubner's and Western Surety's joint proposed findings of fact and conclusions of law.

### 3. Account for Final Settlement

On October 22, 2009, the trial court signed an order approving the account for final settlement filed by Dubner, ordering that no property remains in Doris's estate, discharging Dubner of his duties, and closing the estate. The account provided in part that "[t]he total value of the estate at the beginning of this accounting period [June 26, 2008, to June 12, 2009] was $128,029.26" but that after considering total receipts, total cash disbursements and expenses paid (which included attorneys' fees), and total non-cash disbursements, the total value of the estate on hand was $0.00.

### F. Attorneys' Fees

The trial court conducted hearings on Benolken's, Miller's, and Dubner's applications for attorneys' fees throughout the litigation. The trial court awarded

---

[21]The trial court had granted a summary judgment in favor of Western Surety on March 25, 2009, based on an indemnity agreement executed by Scherry.

31

Benolken $11,200 in attorneys' fees and costs on March 14, 2007, and $104,780.19 in attorneys' fees pursuant to the order approving the account for final settlement. The trial court awarded Miller and Dubner attorneys' fees in the amounts of $25,237.06 and $22,971.85, respectively, pursuant to the order approving the account for final settlement. Scherry and Michael appeal.

### III. SANCTIONS

In their first issues in both cause 02-09-00095-CV and cause 02-09-00233-CV, Scherry and Michael argue that the trial court abused its discretion and committed reversible error by imposing death penalty sanctions. They contend that there was no direct nexus between the offensive conduct and the sanctions imposed, that the sanctions were excessive, and that the sanctions violated their due process and due course of law guarantees.

### A.    Standard of Review and Applicable Law

Trial courts have broad discretion to impose discovery sanctions to secure compliance with discovery rules, to deter other litigants from similar misconduct, and to punish violators. *See Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 849 (Tex. 1992). We therefore review a trial court's imposition of discovery sanctions for an abuse of discretion. *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner, or if it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*,

32

476 U.S. 1159 (1986)).  In reviewing sanctions orders, we are not bound by a trial court's findings of fact and conclusions of law; rather, we must independently review the entire record to determine whether the trial court abused its discretion. *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006).

Texas rule of civil procedure 215.2(b) allows a trial court to sanction a party for failure to comply with a discovery order or request.  Tex. R. Civ. P. 215.2(b).  Sanctions that a trial court may impose include an order refusing to allow the disobedient party to support or oppose designated claims or defenses and an order striking out pleadings or rendering a judgment by default against the disobedient party.  Tex. R. Civ. P. 215.2(b)(4), (5).  When a motion for sanctions asserts that a respondent to a discovery request has failed to produce a document within its possession, custody, or control, the movant has the burden to prove the assertion.  *GTE Commc'ns Sys. Corp. v. Tanner*, 856 S.W.2d 725, 729 (Tex. 1993).

In discovery-sanction cases, a trial court's discretion is limited by the requirement of rule of civil procedure 215.2(b) that the sanctions be "just" and by the parties' constitutional right to due process.  *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917–19 (Tex. 1991).  A sanction is just if a direct relationship exists between the offensive conduct and the sanctions imposed.  *Id.* at 917; *see Chrysler Corp.*, 841 S.W.2d at 849.  A direct nexus exists when the sanction is directed against the true offender and is tailored to

33

remedy any prejudice the discovery abuse caused. *TransAmerican*, 811 S.W.2d at 917. To be just, a sanction must also not be excessive. *Id.* A sanction imposed for discovery abuse should be no more severe than necessary to satisfy its legitimate purposes. *Cire*, 134 S.W.3d at 839. Striking a party's pleadings for discovery abuse is "the most devastating" sanction a trial court may impose and may only be imposed in "exceptional cases" where they are "clearly justified." *GTE*, 856 S.W.2d at 729–30; *TransAmerican*, 811 S.W.2d at 917–18. In *Cire*, the supreme court clarified that

> striking pleadings is a harsh sanction that must be used as a last resort after the trial court has considered lesser sanctions, and that in all but the most egregious and exceptional cases, the trial court must test lesser sanctions before resorting to death penalty sanctions. However, in cases of exceptional misconduct . . . , the trial court is not required to test lesser sanctions before striking pleadings under our previous holdings in *TransAmerican*, *Chrysler*, and *GTE*, so long as the record reflects that the trial court considered lesser sanctions before striking pleadings and the party's conduct justifies the presumption that its claims lack merit. This means that a trial court must analyze the available sanctions and offer a reasoned explanation as to the appropriateness of the sanction imposed.

134 S.W.3d at 842.

## B. Direct Nexus

The record demonstrates that there is a direct nexus between the offensive conduct, the offenders, and the sanctions imposed. The offensive conduct was the repeated and admitted failures by Scherry and Michael to comply with the trial court's orders requiring them to produce documents responsive to

34

Benolken's discovery requests and to "preserve the status quo as to all assets" that were part of Doris's estate and that were the subject of the ancillary lawsuit filed by Deartis against Scherry and Michael. The offensive conduct was attributable to Scherry's and Michael's actions and inactions regarding their failures to comply with the trial court's orders, not the actions or inactions of their attorney or some third party.[22] It is undisputed that the trial court imposed the case-determinative sanctions because of Scherry's and Michael's conduct, which was examined at length over numerous hearings.

Scherry and Michael argue that there was no direct nexus between the offensive conduct and the sanctions imposed because the March 14, 2007 "Sanctions Order" was based upon conduct that allegedly occurred prior to the filing of Deartis's suit on January 19, 2007, and that was part of a different case. But the order that the trial court signed on March 14, 2007, was the second order granting Deartis's motion to compel; the trial court did not enter an order sanctioning Scherry and Michael until March 4, 2008, one year later. Moreover, Benolken, Miller, Dubner, and counsel for Scherry and Michael stipulated that "all

_____

[22]The trial court made the following finding in the March 4, 2008 consolidated order on motions to compel and for sanctions and show cause:

45.   The Court has every confidence in . . . counsel for [Scherry] and [Michael] . . . . Based on the evidence presented over the course of these hearings, the Court believes that [counsel] made every effort to gain [Scherry's] and [Michael's] compliance with this Court's orders that were entered in these Related Cases.

35

prior testimony and documentary evidence obtained and admitted in all prior hearings . . . are admitted conclusively as evidence to be considered and used for all purposes with regard to all matters."

Michael argues that there was no direct nexus between the offensive conduct and the sanctions imposed because he "was not a party to the action other than as a P.O.D. beneficiary of the multi-party accounts brought back into the estate of Doris Preston" and because he was not served. However, in the May 7, 2007 order on show cause, the trial court found that, "[t]o the extent there was a deficiency in any notice on any matters heard by the Court, [Michael] waived notice by his appearance and participation without objection and voluntarily subjected himself to the jurisdiction of the Court." The record supports this finding.

Accordingly, we overrule the part of Scherry's and Michael's first issues challenging the propriety of the sanctions order under the first prong of the *TransAmerican* test.

### C. Excessiveness

Turning to Scherry's and Michael's arguments that the sanctions were excessive, under the standards articulated above, we must (1) decide whether death penalty sanctions were warranted and (2) determine whether the record reflects that the trial court (a) considered lesser sanctions before striking

36

Scherry's and Michael's pleadings and (b) actually tested the lesser sanctions before striking the pleadings unless this is a case involving "exceptional misconduct." *See Cire*, 134 S.W.3d at 842.

The factual and procedural background above sets out in painstaking detail the years of litigation that dragged on due in large part to Scherry's and Michael's refusal to comply with the trial court's orders. As early as January 2007, the trial court expressly recognized that Scherry and Michael had chosen to handle Doris's probate matters through their own informal, intra-family procedures. Scherry's and Michael's attorney even acknowledged that Scherry had "different ideas about the need for a structured arrangement"; in Scherry's opinion, the "informal family arrangements" were to "be unfettered by the . . . unnecessary intrusions of the law." But the trial court exclaimed that it had a duty to require that the administration of Doris's estate be conducted in accordance with the law—although that meant spending time and estate money litigating the case, which included permitting the ad litems to fulfill their duties in representing Deartis's interests. As the trial court identified, without Scherry's and Michael's compliance with its orders, the ad litems "don't have enough information and nobody can go forward."

But after the trial court signed two orders granting motions to compel and conducted several hearings, it made the following findings in the May 7, 2007

37

order on show cause relevant to its various attempts to obtain compliance with its orders:

- "The Court has been very, very patient."

- "The Court has attempted to forebear on the imposition of sanctions[,] which this Court considers a progression of lesser sanctions . . . ."

- "The Court has executed more than one order."

- "The Court has allowed a great deal of time for compliance."

- "The Court has even tried the method of placing [Scherry] in a non-court-record environment . . . in an attempt to secure her proper responses to simple, straightforward document production requests."

- "The Court has attempted to make orders that would maintain the *status quo* . . . ."

- "The Court has not imposed sanctions on [Scherry] in the past in an effort to recognize the possibility that there might have been a misunderstanding on the part of [Scherry] with respect to her court-imposed obligations . . . ."

- "The Court has exercised every leniency toward [Scherry] to allow her every possible latitude."

Notwithstanding all of this, based on Scherry's failure and refusal to abide by the trial court's orders, it concluded that she

- "will not modify her behavior";

- "will not comply";

- "will not produce documents";

- "will continue to impose her own decisions and judgment on the relevancy and materiality of documents";

- "will continue to withhold documents and offer irrelevant excuses and reasons for failure to tender documents"; and

38

- "will continue to take positions which are not defensible."

After making these findings and conclusions, instead of imposing sanctions, the trial court gave Scherry and Michael yet *another* opportunity to "purge" their constructive contempt. But Scherry and Michael ultimately failed to do so, as the hearings on June 13, 2007; July 30, 2007; July 31, 2007; August 1, 2007; September 18, 2007; and October 26, 2007, reflect.[23] Among other things, Scherry admitted that there were more documents relating to Doris's estate that she had not produced, and Michael admitted that he had written checks using funds from a disputed First Bank account after the trial court had ordered him and Scherry to preserve the status quo as to "all assets." In the March 4, 2008 order on motion to compel and for sanctions and show cause, the trial court consequently made the following findings regarding Scherry:

1. Instead of complying with the Court's orders and heeding this Court's repeated warnings, Scherry Levi engaged in an unremorseful pattern and practice of her own choosing, with only a patchy and self-determined production of relevant documents in the face of clear and unambiguous instructions to the contrary from this Court. The Court finds that Scherry Levi has possession, custody, and control of documents which are clearly responsive to [Ad Litems'] discovery requests and this Court's orders compelling production which she has not produced.

2. The Court finds that [Scherry] wholly failed to produce either a fiduciary accounting or the associated records, both of which were required by previous orders. . . .

[23]The trial court even excused Scherry's and Michael's failure to comply with the May 18, 2007 deadline that it had set earlier.

. . . .

5.  The Court finds that [Scherry] did not provide any valid or justifiable excuse or reason for the absence of the documents, the records[,] and the accounting, and that she did not show any cause whatsoever as to why this Court should not impose the sanctions against her . . . .

. . . .

7.  Despite being placed on adequate notice of the contested nature of the accounts on which [Michael's] name appears in addition to [Doris's], as well as this Court's previous order regarding preserving the *status quo* of such account, [Scherry] conspired and participated in [Michael's] dissipation of large portions of the $70,000 that was contained in such alleged survivorship account. . . .

. . . .

12.  The Court finds that despite clear direction from this Court . . . that [Scherry] could not commingle funds and assets . . . belonging to [Deartis] and/or the Estate . . . , she continued obstinately to handle Deartis's property and Estate property in her own way. . . .

13.  [Scherry], in her capacity as Dependent Administratrix, breached her fiduciary duties and trust that she owed to the Estate in numerous respects . . . .

. . . .

15.  [Scherry] breached her fiduciary duties and trust that she owed to [Deartis] in numerous respects . . . .

The trial court made the following findings regarding Michael:

20.  [Michael] was placed on adequate notice that the joint account he held with [Doris], which he alleged had a valid right of survivorship designation, was claimed to be the property of [Deartis] and/or the Estate. Despite being placed on adequate

40

notice of the contested nature of the accounts on which [Michael's] name appears in addition to [Doris's], as well as this Court's previous order regarding preserving the *status quo* of such account, [Michael] has testified that he has unilaterally expended large portions of the $70,000 that was contained in such alleged survivorship account, under his own belief and idea that it was his money . . . .

. . . .

22. The evidence further showed that [Michael] not only joined in with [Scherry's] actions in this matter, including her actions with respect to her refusal to comply with this Court's discovery orders and the Ad Litems' discovery requests, but also intentionally and actively directed [Scherry] to act as she did, including, but not limited to, her actions with respect to her refusal to comply with this Court's discovery orders and the Ad Litems' discovery requests.

. . . .

24. The Court finds that [Michael] was in possession of documents relevant to this case, and which he specifically was ordered to produce, and was able to produce but refused to do so. . . .

The trial court made the following "General Findings":

44. It is an accurate statement that the Court "has bent over backwards" over the course of many months to provide [Scherry] and [Michael] every chance to comply with their duties and obligations to [Deartis], this Court, and the parties in each of these Related Cases, including, but not limited to, extending deadlines, excusing nonperformance between May 7, 2007 and June 4, 2007, offering conferences to explain duties, holding lengthy hearings, answering questions posed by [Scherry] from the witness stand, explaining their duties in open court, and entering orders which allowed for the opportunity to purge contempt and their repeated failure and refusal to comply with valid Court orders and Ad Litems' discovery requests, all to no avail. . . . The Court has extended every forbearance, every delay, every second

41

chance that is possible in these Related Cases in its attempt to avoid the very result that now has occurred in these cases, i.e., extremely high costs, including court-appointed fiduciaries' and attorneys' fees and expenses, in complex and growing litigation because of the inactions and actions of [Scherry] and [Michael].

. . . .

47. Throughout these proceedings in each of the Related Cases, [Scherry] and [Michael] have flaunted their disrespect for this Court and the system it is obliged to orchestrate and implement. Their own testimony shows that [Scherry] and [Michael] operated on their own alternate system. . . .

. . . .

55. Although the remedy contemplated herein associated with a failure to comply might be harsh, the Court finds and concludes that the enforcement of [Scherry's] and [Michael's] duties and obligations in the circumstances present here are of paramount importance. The Court is recalcitrant, reluctant, and unwilling to dispose of a case on procedural grounds and, therefore, favors progressive sanctions. The Court has been reluctant to assess what are referred to as "death penalty" sanctions, but because of the conduct of the parties, the evidence presented, and the reasons detailed in this order, will now implement said sanctions.

. . . .

60. *Based upon* [*Scherry's*] *and* [*Michael's*] *persistent and obstructive behavior in this case*, including, but not limited to, their repeated failure and refusal to engage in good faith discovery and obey lawful Court orders compelling discovery, *there now has arisen the presumption that they have engaged [in] such a pernicious course of conduct because their claims and defenses have no merit.*

. . . .

42

- 62.  *The Court finds there are no lesser sanctions which could be implemented to gain [Scherry's] and [Michael's] cooperation and compliance in this case.  The Court is mindful of Ad Litems' strenuous argument that monetary sanctions likely may constitute an empty remedy against either or both [Scherry] and [Michael] because it is doubtful they are collectible.  The Court finds that there is no reasonable alternative to the granting of the most severe death penalty sanctions in each of the Related Cases as to both [Scherry] and [Michael].*  [Emphasis added.]

The record thus shows that the trial court afforded Scherry and Michael numerous opportunities to comply with its orders, but they proceeded to administer Doris's estate using their own informal procedures and admitted that they had failed to comply with the trial court's orders, even after being given numerous opportunities to comply.  On the totality of this record, we conclude that death penalty sanctions were warranted in this exceptional case.

The March 4, 2008 consolidated order on motions to compel and for sanctions and show cause contains a lengthy, reasoned explanation as to why death penalty sanctions were appropriate.  The order also clearly shows that the trial court considered, but ultimately rejected, lesser monetary sanctions.  The trial court indicated that it was "reluctant" to assess death penalty sanctions but, nonetheless, concluded that there was "no reasonable alternative to the granting of the most severe death penalty sanctions" because of the likelihood that the lesser monetary sanctions would be an "empty remedy."  The March 4, 2008 order further shows that the trial court reasonably found that Scherry's and Michael's persistent and obstructive behavior justified the presumption that their

43

defenses to Deartis's and Dubner's claims lacked merit. "Ordinarily, a trial court would also be required to test the effectiveness of lesser sanctions by actually implementing and ordering each sanction that would be appropriate to promote compliance with the trial court's orders in this case." *Cire*, 134 S.W.3d at 842. But because of Scherry's and Michael's blatant disregard for the discovery process in this exceptional case involving protracted misconduct, death penalty sanctions were clearly justified, and the trial court was not required to first test lesser sanctions before imposing case determinative sanctions.[24] *See id.*

Scherry's and Michael's arguments that their constitutional rights were violated because the trial court's orders lacked specificity and because Michael was not a party to the estate action are unpersuasive. The May 7, 2007 order on show cause set out in detail, again, the discovery that Scherry and Michael were ordered to produce, and Michael submitted to the jurisdiction of the trial court on several occasions throughout the record. Scherry and Michael do not argue that they did not understand the trial court's orders; Scherry testified that she "just didn't think to send" responsive documents.

Accordingly, we conclude and hold that the trial court did not abuse its discretion by imposing death penalty sanctions, and we overrule the remainder of

---

[24]Nonetheless, the trial court stated at the conclusion of the April 23, 2007 show cause hearing that it "will have under advisement the possibility of the following sanctions: Removal of [Scherry] as . . . dependent administratrix . . . ." The trial court followed through and imposed this lesser sanction, removing Scherry as dependent administratrix on June 14, 2007, and appointing Dubner successor dependent administrator. The trial court therefore tested lesser sanctions.

Scherry's and Michael's first issues, including their arguments challenging the sanctions order under the second prong of the *TransAmerican* test.[25]

## IV. DISPUTED FIRST BANK ACCOUNTS

Scherry and Michael assert arguments relevant to the disputed First Bank accounts in their second, seventh, and eighth issues in cause 02-09-00095-CV and their second, sixth, and seventh issues in cause 02-09-00233-CV.

### A. Second Issue—Cause 02-09-00095-CV

Citing *Chandler v. Welborn*, 156 Tex. 312, 294 S.W.2d 801 (1956), Scherry and Michael argue that "any and all causes of action founded upon the survivorship accounts . . . belonged to the estate of [Doris] and not [Deartis]" because "[t]he Texas Supreme Court has held that an heir does not have [a] right to bring a suit during the pendency probate of the estate except for the benefit of the estate." Indeed, the executor or administrator of a decedent's estate generally has the exclusive right to bring suit for the recovery of real and personal property belonging to the estate. *See* Tex. Prob. Code Ann. § 233A (West 2003); *Frazier v. Wynn*, 472 S.W.2d 750, 752 (Tex. 1971) ("It is settled in Texas that the personal representative of the estate of a decedent is ordinarily the only person entitled to sue for the recovery of property belonging to the estate."); *Chandler*, 156 Tex. at 318, 294 S.W.2d at 806 ("When administration is

---

[25]To the extent that Scherry and Michael raise any other arguments within their first issues that are not addressed by our analysis, those arguments are waived as inadequately briefed. *See* Tex. R. App. P. 38.1(i).

45

pending, the heirs are generally not entitled to maintain a suit for the recovery of property belonging to the estate . . . .").  However, the supreme court in *Chandler* also recognized an exception to the general rule when "it appears that the administrator will not or cannot act, or that his interest is antagonistic to that of the heirs desiring to sue."  156 Tex. at 318, 294 S.W.2d at 806.  Under this exception, an heir may maintain a suit to recover property belonging to the estate while the administration is pending.  *See id.*; *In re Guardianship of Archer*, 203 S.W.3d 16, 22 (Tex. App.—San Antonio 2006, pet. denied).

Assuming that Scherry and Michael may even assert this argument,[26] on this record, Deartis had standing to sue to recover property belonging to Doris's estate because Scherry's interest in the disputed First Bank accounts was indisputably antagonistic to Deartis's interest.  *See Chandler*, 156 Tex. at 318, 294 S.W.2d at 806.  To the extent Deartis sued Scherry and Michael to recover the funds from the disputed First Bank accounts under the theory that the funds belonged to him, *Chandler* is inapposite.  Accordingly, we overrule Scherry's and Michael's second issue in cause 02-09-00095-CV.

## B.    Second Issue—Cause 02-09-00233-CV

---

[26]*See Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 242 S.W.3d 67, 71–72 (Tex. App.—San Antonio 2007, pet. denied) (holding that when all allegations in petition, including those that established standing, were deemed admitted as a result of a default judgment, defaulting party was estopped from denying the plaintiff's standing).

Scherry and Michael argue that section 442 of the probate code "limits the liability of any payee to an amount not greater 'than the amount that the party, P.O.D. payee, or beneficiary received from the multiple-party account'"; that "as a matter of law there could not have been a breach of fiduciary duty, fraud, conversion, or any other cause of action against Appellants by Appellee related to the accounts"; and that "[a]ny potential liability was limited to the amount of the accounts for the benefit of the estate of Doris Preston."

Probate code section 442 authorizes the use of multi-party account funds to pay debts, taxes, and expense of administration under certain circumstances. Tex. Prob. Code Ann. § 442 (West Supp. 2010). Neither Scherry nor Michael argue that the disputed First Bank accounts were not needed to pay for the significant expenses of administration. Further, the damages expressly awarded to the estate pursuant to the section 442 claims are consistent with the amounts that First Bank turned over to Scherry and Michael after Doris's death. At the March 13, 2006 prove-up hearing, Scherry disclosed for the first time that Doris had entrusted two certificate of deposit accounts to Scherry and Michael—one worth approximately $79,000 and another worth approximately $49,000. The trial court found in favor of Dubner on his section 442 claims against Michael and Scherry in the amount of $78,368.14 and against Scherry in the amount of $49,206.40. Scherry and Michael did not preserve for appellate review their argument challenging the award of prejudgment interest, nor do they direct us to

47

any relevant authority. *See Allright, Inc. v. Pearson*, 735 S.W.2d 240, 240 (Tex. 1987) (holding that error regarding award of prejudgment interest must be preserved); *see also* Tex. R. App. P. 38.1(i). We overrule Scherry's and Michael's second issue in cause 02-09-00233-CV.

**C.    Seventh and Eighth Issues—Cause 02-09-00095-CV and Sixth and Seventh Issues—Cause 02-09-00233-CV**

In their seventh and eighth issues in cause 02-09-00095-CV[27] and sixth and seventh issues in cause 02-09-00233-CV,[28] Scherry and Michael argue that the funds in the disputed First Bank accounts belonged to them. It is well established that once a default judgment is taken on an unliquidated claim, all allegations of fact set forth in the petition are deemed admitted, except the amount of damages. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 (Tex. 1992); *Stoner v. Thompson*, 578 S.W.2d 679, 684 (Tex. 1979). "[I]f the facts set out in the petition allege a cause of action, a default judgment conclusively establishes the defendant's liability." *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 731 (Tex. 1984).

---

[27]Scherry and Michael argue in the seventh issue that Deartis's pleadings establish as a matter of law that the disputed First Bank accounts were joint accounts with rights of survivorship. In the eighth issue, Scherry and Michael argue that the record does not support Deartis's claim that the funds in the disputed accounts did not belong to them.

[28]Scherry and Michael argue in the sixth issue that the disputed accounts' signature cards and incorporated documents created a joint tenancy with rights of survivorship. In the seventh issue, Scherry and Michael argue that there is no evidence in the record to support the trial court's judgment.

48

Deartis alleged the following in his third amended petition:

> Doris Rose Preston ("Decedent") died on August 27, 2005 leaving only one heir, the Plaintiff, Deartis Preston. Prior to Decedent's death, she established certain accounts on which her sister, [Scherry], and her brother, [Michael], were signatories or had access. Two of these bank accounts were held at First Bank, initially bearing Account Numbers xxxxxxxx0612 (the "0612 Account") and xxxxxxxx0433 (the "0433 Account") (collectively the "Accounts"), and were certificates of deposit which were opened April 27, 2004 and October 8, 2003, respectively. There were signature cards executed on the Accounts, which checked boxes titled "Joint – With Survivorship," which Plaintiff contends are not sufficient to establish the Accounts as valid survivorship accounts. Moreover, the 0612 Account had a six month maturity, and matured on October 27, 2004. The 0433 Account had a three month maturity, and matured on January 8, 2004. No new signature cards were executed when new certificates of deposit were opened, either upon the maturity of the Accounts, or any downstream maturity of different accounts (the "New COD Accounts"). Plaintiff alleges that the funds in the Accounts and/or New COD Accounts constitute his sole and separate property . . . .

Dubner alleged the following against Scherry and Michael:

> No multiple-party account will be effective against an estate of a deceased party to transfer to a survivor sums needed to pay debts, taxes, and expenses of administration if other assets of the estate are insufficient. In this case, the expenses of administration outweigh the assets of the estate. Both [Scherry] and [Michael] have claimed the funds held by First Bank in accounts *****0612 and ******0433 are survivorship accounts. If these accounts are survivorship accounts, then the funds needed to pay administration expenses, taxes, and debts belong to the Estate of [Doris].

The trial court concluded that "[t]he facts pleaded in [Deartis's] Third Amended Original Petition in Cause No. PR-2005-00802-01 are established by the default liability judgment granted by order of this Court dated March 4,

49

2008."[29]    The trial court also concluded that "[t]he facts pleaded in Dubner's Petition are established by the default liability judgment granted in the 3-4-08 Order."   Accordingly, in light of the default judgment, Scherry and Michael were deemed to have admitted all of Deartis's and Dubner's factual allegations, except damages, establishing their default judgment liability, and they may not complain of those admissions now.   *See Holt Atherton*, 835 S.W.2d at 83; *Morgan*, 675 S.W.2d at 731.   We overrule the seventh and eighth issues in cause 02-09-00095-CV and the sixth and seventh issues in cause 02-09-00233-CV.[30]

## V.  SAILFISH HOUSE

### A.    Fourth Issue—Cause 02-09-00095-CV

In the fourth issue in cause 02-09-00095-CV, Scherry and Michael challenge the portion of the amended final default judgment that "divest[s] [Scherry] of title [to the Sailfish house] through finding a constructive trust on the property."   They argue that "[t]he constructive trust imposed on the 'Sailfish' property was a remedy not available to the Probate Court."

A constructive trust is a relationship with respect to property, subjecting the person by whom the title to the property is held to an equitable duty to convey it to another on the ground that his acquisition or retention of the property is

---

[29]We have already reasoned above that Deartis had standing to assert claims against both Scherry and Michael.

[30]To the extent that Scherry and Michael raise any other arguments within these six issues that are not addressed by our analysis, those arguments are waived as inadequately briefed.  *See* Tex. R. App. P. 38.1(i).

50

wrongful and that he would be unjustly enriched if he were permitted to retain the property. *Talley v. Howsley*, 142 Tex. 81, 86, 176 S.W.2d 158, 160 (Tex. 1943). Thus, a constructive trust is a device equity uses to remedy a wrong. *Lesikar v. Rappeport*, 33 S.W.3d 282, 303 (Tex. App.—Texarkana 2000, pets. denied); *see Meadows v. Bierschwale*, 516 S.W.2d 125, 131 (Tex. 1974). A constructive trust may be imposed when one acquires legal title to property in violation of a fiduciary relationship. *Lesikar*, 33 S.W.3d at 303. While the form of a constructive trust is practically without limit, its existence depends upon the circumstances. *Troxel v. Bishop*, 201 S.W.3d 290, 297 (Tex. App.—Dallas 2006, no pet.). Because imposition of a constructive trust constitutes an equitable remedy, we review the trial court's decision to impose a constructive trust under an abuse of discretion standard. *Baker Botts, L.L.P. v. Cailloux*, 224 S.W.3d 723, 736 (Tex. App.—San Antonio 2007, pet. denied).

Deartis alleged that Scherry and Michael breached fiduciary duties that they owed to him by using funds from the disputed First Bank accounts—funds that Deartis averred belonged to him—to purchase the Sailfish house. *See Punts v. Wilson*, 137 S.W.3d 889, 891 (Tex. App.—Texarkana 2004, no pet.) (stating that the relationship between an executor and the estate's beneficiaries is one that gives rise to a fiduciary duty as a matter of law). When one's funds or other assets are used by a fiduciary to acquire property for himself, the aggrieved party may seek the property itself or its value. *Lesikar*, 33 S.W.3d at 304. In this

51

case, the trial court ordered a conveyance of the Sailfish house to Deartis. *See Carr v. Weiss*, 984 S.W.2d 753, 756 (Tex. App.—Amarillo 1999, pet denied) (affirming judgment in which trial court imposed constructive trust upon property and ordered conveyance of that property). To the extent that Scherry and Michael challenge the award by attempting to raise a fact issue that money from the disputed First Bank accounts was not used to purchase the Sailfish house, we have already explained that when the trial court granted a default judgment in favor of Deartis, all allegations of fact set forth in Deartis's petition were deemed admitted, and neither Scherry nor Michael may challenge those admissions now. *See Holt Atherton*, 835 S.W.2d at 83. We overrule the fourth issue in cause 02-09-00095-CV.

### B.    Third Issue—Cause 02-09-00095-CV

In the third issue in cause 02-09-00095-CV, Scherry argues that the trial court erred by ordering her to make payments on the Sailfish house after imposing a constructive trust. The only part of the amended final default judgment that appears to order Scherry to continue making payments on the Sailfish house is the permanent injunction, which enjoins Scherry and all others from undertaking any actions that would "endanger" the Sailfish house in any way, including the "failure to make payments on the promissory note secured by the Sailfish [h]ouse and lot." Scherry had no interest in the Sailfish house after the trial court ordered a conveyance of her interest to Deartis. Aside from

characterizing payments as support, an obligation to make installment payments on a home mortgage is not enforceable by contempt because it constitutes imprisonment for debt. *Whitt v. Whitt*, 684 S.W.2d 731, 734–35 (Tex. App.—Houston [14th Dist.] 1984, no writ); *see Ex parte Duncan*, 462 S.W.2d 336, 338 (Tex. Civ. App.—Houston [1st Dist.] 1970, no writ). A trial court has no ability to enforce a void judgment, which is entirely null within itself. *Easterline v. Bean*, 121 Tex. 327, 334, 49 S.W.2d 427, 429 (Tex. 1932). We sustain Scherry's and Michael's third issue in cause 02-09-00095-CV to the extent that they complain about the part of the permanent injunction ordering Scherry to continue making payments on the Sailfish house.

## VI. EQUITABLE LIEN

In the third issue in cause 02-09-00233-CV, Scherry and Michael challenge the portion of the final judgment that establishes an equitable lien on the Sailfish house in the amount of $25,070.34 and in favor of Doris's estate to secure payment for funds from the 0612 account that were used for the purchase of the Sailfish house. Scherry and Michael contend that this part of the judgment is void because "the Court previously divested [Scherry] of any interest in the Sailfish house in the companion case." They set forth no further argument and no citations to any relevant authorities to support this single sentence contention. The argument is inadequately briefed and, therefore, waived. *See* Tex. R. App. P. 38.1(i); *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284

53

(Tex. 1994) (discussing "long standing rule" that issue may be waived due to inadequate briefing). We overrule the third issue in cause 02-09-00233-CV.

## VII. ATTORNEYS' FEES AS DAMAGES

In the fourth issue in cause 02-09-00233-CV, Scherry and Michael challenge the awards to Doris's estate of (1) $29,125.45 "for attorney's fees and expenses of [Dubner] that would not have otherwise been incurred except for the actions and/or inactions of" Scherry; (2) $53,186.62 "for fees and expenses incurred by [Miller] that would not have otherwise been incurred except for the actions and/or inactions of" Scherry; and (3) $174,067.00 "for fees and expenses incurred by [Benolken] that would not have otherwise been incurred except for the actions and/or inactions of" Scherry. In the fifth issue in cause 02-09-00095-CV, Scherry and Michael challenge the award to Deartis of "actual damages" in the amount $127,000. Scherry and Michael do not challenge the award of attorneys' fees to Benolken, Miller, and Dubner pursuant to the order approving the account for final settlement.

The trial court awarded these damages based on attorneys' fees incurred as a result of Scherry's and Michael's misconduct.[31] *See Oscar M. Telfair, III, P.C. v. Bridges*, 161 S.W.3d 167, 170 (Tex. App.—Eastland 2005, no pet.) (recognizing recovery of attorneys' fees based upon equitable grounds when

---

[31]It is less clear that the judgment in cause 02-09-00095-CV awarded damages based on attorneys' fees incurred, but the record supports this conclusion.

54

claimant was required to prosecute or defend litigation involving third party as consequence of wrongful act of defendant). The First Court of Appeals recently addressed this exception to the general rule for the recovery of attorneys' fees, reasoning as follows:

> [Appellee] acknowledges that the general rule in Texas is that "attorney's fees may not be recovered from an opposing party unless such recovery is provided for by statute or by contract between the parties." However, in *Turner*, the supreme court recognized, without adopting, an exception to the general rule provided for in the Restatement of the Law: Torts, Vol. 4 § 914. The exception provides that "where a plaintiff has been involved in litigation with a third party as a result of the tortious act of another, the plaintiff may recover in a separate suit for his reasonable and necessary expenses of the prior litigation." Certain prerequisites must, however, be met. These include: (1) the plaintiff must have incurred attorney's fees in the prosecution or defense of a prior action, and (2) the litigation must have involved a third party and must not have been brought against the defendant in the same action in which the fees are sought.

> Subsequent to *Turner*, this Court and other Texas courts of appeals have held that "equitable principles may allow the recovery of attorney's fees and other litigation expenses 'where a party was required to prosecute or defend the previous suit as a consequence of the "wrongful act" of the defendant.'"

*Brown & Brown of Tex., Inc. v. Omni Metals, Inc.*, 317 S.W.3d 361, 399–400 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (citations omitted); *see also G.R.A.V.I.T.Y. Enters., Inc. v. Reece Supply Co.*, 177 S.W.3d 537, 546–47 (Tex. App.—Dallas 2005, no pet.).

Although we are not directed to any case in which this court has recognized this exception, the exception is nonetheless inapplicable regarding

55

cause 02-09-00233-CV because the fees were not incurred in a prior litigation involving a third party; the fees were incurred in the same action for which they were awarded and for conduct caused by the same defendant. *See Brown & Brown*, 317 S.W.3d at 400; *see also MRO Sw., Inc. v. Target Corp.*, No. 04-07-00078-CV, 2007 WL 4403912, at *2 (Tex. App.—San Antonio Dec. 19, 2007, pet. denied) (mem. op.). Accordingly, we hold that the trial court erred by awarding Doris's estate attorneys' fees as damages. We sustain Scherry's and Michael's fourth issue in cause 02-09-00233-CV.

Similarly, in cause 02-09-00095-CV, the award of "actual damages" was based on attorneys' fees incurred by Benolken and Miller in the same case and involving the same defendants. We therefore hold that the trial court erred by awarding Deartis attorney's fees as actual damages, and we sustain Scherry's and Michael's fifth issue in cause 02-09-00095-CV. *See Brown & Brown*, 317 S.W.3d at 400; *MRO Sw.*, 2007 WL 4403912, at *2.

## VIII. SEVERING OF CAUSES

In the sixth issue in cause 02-09-00095-CV and the fifth issue in cause 02-09-00233-CV, Scherry and Michael argue that the trial court committed reversible error by severing Deartis's suit against them from Dubner's action on behalf of Doris's estate.

The trial court has broad discretion to sever causes. *Guar. Fed. Savs. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 658 (Tex. 1990) (op. on

56

reh'g). A claim is severable if (1) the controversy involves more than one cause of action, (2) the severed claim is one that would be the proper subject of a lawsuit if independently asserted, and (3) the severed claim is not so interwoven with the remaining action that they involve the same facts and issues. *Id.*; *see State Dep't of Highways & Pub. Transp. v. Cotner*, 845 S.W.2d 818, 819 (Tex. 1993). The controlling reasons for a severance are to do justice, avoid prejudice, and further convenience. *Horseshoe*, 793 S.W.2d at 658.

We have reviewed the entire record, and we hold that the trial court acted within its broad discretion by severing Deartis's suit from Dubner's suit on behalf of Doris's estate. *See id.* Further, Scherry and Michael have demonstrated no harm, considering that the trial court did not enter conflicting judgments in regard to the disputed First Bank accounts. Accordingly, we overrule Scherry's and Michael's sixth issue in cause 02-09-00095-CV and fifth issue in cause 02-09-00233-CV.

## IX. EXEMPLARY DAMAGES

In the eighth issue in cause 02-09-00233-CV and the ninth issue in cause 02-09-00095-CV, Scherry and Michael challenge the awards of exemplary damages. We construe their arguments as challenges to the legal sufficiency of the evidence to support the awards.

Unliquidated damages include exemplary damages; therefore, evidence must be presented of exemplary damages to sustain an award thereof in a

57

default judgment.  *Herbert v. Greater Gulf Coast Enters., Inc.*, 915 S.W.2d 866, 872 (Tex. App.—Houston [1st Dist.] 1995, no writ).  Exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which it seeks recovery of exemplary damages results from fraud, malice, or gross negligence.  Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a) (West Supp. 2010).  If the claimant relies on a statute establishing a cause of action and authorizing exemplary damages in specified circumstances or in conjunction with a specified culpable mental state, exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the damages resulted from the specified circumstances or culpable mental state.  *Id.* § 41.003(c).  Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.  *Id.* § 41.001(2) (West 2008); Tex. Fam. Code Ann. § 101.007 (West 2008); *State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 31 (Tex. 1994).  This intermediate standard falls between the preponderance standard of civil proceedings and the reasonable doubt standard of criminal proceedings.  *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979).  While the proof must be of a heavier weight than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed.  *Addington*, 588 S.W.2d at 570.

When a specific attack is made upon the legal or factual sufficiency of the evidence to support the trial court's determination of damages in a default judgment, the appellant is entitled to a review of the evidence produced. *Dawson v. Briggs*, 107 S.W.3d 739, 748 (Tex. App.—Fort Worth 2003, no pet.). In evaluating the evidence for legal sufficiency, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that its finding was true. *K.E.W.*, 315 S.W.3d at 20*; Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008). We review all the evidence in the light most favorable to the finding. *Hogue*, 271 S.W.3d at 248. We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *K.E.W.*, 315 S.W.3d at 20; *Hogue*, 271 S.W.3d at 248. We disregard evidence contrary to the finding unless a reasonable factfinder could not. *K.E.W.*, 315 S.W.3d at 20; *Hogue*, 271 S.W.3d at 248. That is, we consider undisputed evidence even if it is contrary to the finding. *Hogue*, 271 S.W.3d at 248; *City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005). Evidence that merely exceeds a scintilla is not legally sufficient. *K.E.W.*, 315 S.W.2d at 20. If we determine that no reasonable factfinder could form a firm belief or conviction that its finding was true, then we must conclude that the evidence is legally insufficient. *Diamond Shamrock Ref. Co. v. Hall*, 168 S.W.3d 164, 170 (Tex. 2005); *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex. 2004). Generally, if we determine that evidence is legally insufficient, we must

then reverse and render judgment. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see* Tex. R. App. P. 43.3; *Garza*, 164 S.W.3d at 626 & n.58.

## A.  Ninth Issue—Cause 02-09-00095-CV

The trial court awarded Deartis exemplary damages in the amount of $414,000.  The trial court made the following findings of fact, among others:

7.    By her breach of fiduciary duty, [Scherry] intended to gain an additional unwarranted benefit and engaged in self dealing.

8.    By his breach of fiduciary duty, [Michael] intended to gain an additional unwarranted benefit and engaged in self dealing.

We have already held above that the trial court erred by awarding Deartis "actual damages" in the amount of $127,000 based on attorneys' fees. Notwithstanding interest, the only other relief that the trial court awarded Deartis—upon his claims for breach of fiduciary duty or conspiracy to breach fiduciary duties—related to the Sailfish house, including (1) title to the Sailfish house, (2) an injunction enjoining "any actions which would endanger the Sailfish [h]ouse in any way," and (3) a declaration that the Sailfish house was Deartis's sole and separate property.  Exemplary damages are not available unless a plaintiff establishes that it sustained actual loss or injury as the result of an underlying tort.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.004(a) (West 2008); *Fed. Express Corp. v. Dutschmann*, 846 S.W.2d 282, 284 (Tex. 1993).  While the mere grant of injunctive relief will not support an award of punitive damages, the supreme court has recognized a "recovery of property" exception to the rule

60

requiring the recovery of actual damages, noting that "where equity requires the return of property, this 'recovery of the consideration paid as a result of fraud constitutes actual damages and will serve as a basis for the recovery of exemplary damages.'" *Nabours v. Longview Sav. & Loan Ass'n*, 700 S.W.2d 901, 904–05 (Tex. 1985) (reasoning that its holding that the mere grant of injunctive relief will not support an award of punitive damages "should not be confused with an absolute refusal to allow punitive damages in a case where equitable relief is had"); *Lesikar*, 33 S.W.3d at 310. Deartis's award of complete title to the Sailfish house is an award that appears to fit within the requirement that he recover actual damages to sustain an award of exemplary damages.

The trial court found that "[t]here is factually sufficient evidence to justify the exemplary damages award for breach of fiduciary duty . . . ." A defendant's intentional breach of fiduciary duty is a tort for which a plaintiff may recover exemplary damages. *Lesikar*, 33 S.W.3d at 311. The court in *Lesikar* stated,

> While it is a general rule that Texas courts allow the recovery of punitive damages where the defendant, in committing a tort, acted willfully, maliciously, or fraudulently, where punitive damages are awarded for breach of fiduciary duty the actual motives of the defendant and whether the defendant acted with malice are immaterial. But something more than a simple breach is required for the recovery of punitive damages; the acts constituting the breach must have been fraudulent, or at least *intentional*. *An intentional breach may be found where the fiduciary intends to gain an additional benefit for himself*. [T]he Supreme Court [has] suggested that willful and fraudulent acts are presumed when the fiduciary . . . gains an additional benefit for himself as a result of his breach.

61

*Id.* (emphasis added) (citations omitted). We therefore examine the sufficiency of the evidence to support the award of exemplary damages for Scherry's or Michael's breach of fiduciary duty in regard to the Sailfish house.

At the prove-up hearing on Deartis's damages, Miller testified that Scherry paid $24,520.38 towards the closing on the Sailfish house and that those funds came from a check that Michael had drawn on one of the disputed First Bank accounts. Miller stated that Scherry did not contribute any of her own money towards the purchase of the Sailfish house; that Scherry placed both her name and Deartis's name on the title to the Sailfish house; that such action constituted a breach of both Scherry's and Michael's fiduciary duties to Deartis; and that Scherry "obtain[ed] a benefit" by having her name on the title to the Sailfish house. Miller did not explain or elaborate in any way on her testimony that Scherry "obtain[ed] a benefit." Although Scherry may have intended to have her name on the title and, according to Miller, "obtained a benefit" by doing so, there is no evidence that Scherry or Michael breached a fiduciary duty to Deartis by putting Scherry's name on the title *with the intent* to gain some additional benefit, nor do the surrounding circumstances or circumstantial evidence support that inference.[32] In other words, there is no evidence that Scherry or Michael breached any fiduciary duty to Deartis for the purpose of obtaining a benefit for

---

[32]At the January 19, 2007 hearing on Deartis's motion to compel, Scherry testified that title to the Sailfish house was partly in her name because Deartis had no credit in his name.

themselves. Even if Miller's testimony amounted to more than a scintilla of evidence of that fact and did more than raise a mere surmise and suspicion of that fact, her testimony, without more, was not capable of producing a firm belief or conviction that Scherry or Michael breached a fiduciary duty with the intent to gain some benefit therefrom. To the extent that the trial court awarded exemplary damages based on some other theory, there is no evidence that any harm resulted from fraud, malice, or gross negligence. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a). We hold that the evidence is legally insufficient to support the award of exemplary damages, and we sustain Scherry's and Michael's ninth issue in cause 02-09-00095-CV.

**B.    Eighth Issue—Cause 02-09-00233-CV**

The trial court awarded Doris's estate exemplary damages in the amount of $180,716.94. The trial court adopted the following findings regarding exemplary damages:

31.    The clear and convincing evidence reflects that the conduct of [Scherry] and [Michael] has been outrageous and that both [Scherry] and [Michael] have at all times exhibited a flagrant disregard of the orders of this Court.

32.    [Michael] at all times was fully aware that [Scherry] was acting in contravention of her fiduciary duties as administratrix of the Estate and conspired with [Scherry] in connection with such breach.

33.    Based on the conduct of [Michael] and [Scherry], it would be appropriate to award the Estate judgment . . . for exemplary damages in the amount of $180,716.94.

63

At the prove-up hearing on the damages to Doris's estate, Dubner testified in the narrative, "I'm asking the Court to give -- award exemplary damages, based on clear and convincing evidence, of two times the amount of actual damages, not including attorney's fees, strictly on the damages themselves for the funds . . . ." On cross-examination, Dubner agreed that Scherry's conduct during the case was "egregious," and he testified that Scherry and Michael had "obfuscated the legal process" and that "this case is the type of case that does warrant exemplary damages, based on [Scherry's] behavior and the fact that she failed continuously, time after time, to follow court orders, to do things that she was asked to do, and basically thumbed her nose at the entire process."

To the extent that the trial court awarded exemplary damages based on Dubner's breach of fiduciary duty claims, there is no evidence that Scherry or Michael breached a fiduciary duty to Doris's estate with the intent to gain some additional benefit. *See Lesikar*, 33 S.W.3d at 311. To the extent the trial court awarded exemplary damages based on some other theory, there is no evidence that any harm resulted from fraud, malice, or gross negligence. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a). We hold that the evidence is legally insufficient to support the award of exemplary damages, and we sustain Scherry's and Michael's eighth issue in cause 02-09-00233-CV.

64

## X. CONCLUSION

Having sustained Scherry's and Michael's third, fifth, and ninth issues in cause 02-09-00095-CV, we modify the amended final default judgment in that cause to delete (1) the award of actual damages in the amount $127,000.00, (2) the award of exemplary damages in the amount of $414,000.00, and (3) the portion of the permanent injunction requiring Scherry to continue making payments on the Sailfish house. Having sustained Scherry's and Michael's fourth and eighth issues in cause 02-09-00233-CV, we modify the final judgment in that cause to delete (1) the awards for fees and expenses in the amounts of $29,125.45, $53,186.62, and $174,067.00 and (2) the award of exemplary damages in the amount of $180,716.94. Having overruled the remainder of their issues in both causes, we affirm the judgments in cause 02-09-00095-CV and cause 02-09-00233-CV as modified.

BILL MEIER
JUSTICE

PANEL:  LIVINGSTON, C.J.; MCCOY and MEIER, JJ.

LIVINGSTON, C.J. filed a concurring and dissenting opinion.

DELIVERED:  July 14, 2011

65



# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-09-00095-CV
## NO. 02-09-00233-CV

IN THE ESTATE OF DORIS
ROSE PRESTON, DECEASED

------------

FROM THE PROBATE COURT OF DENTON COUNTY

------------

## CONCURRING AND DISSENTING OPINION

------------

I join the majority opinion and judgments in all respects except for the failure to affirm the award of exemplary damages.

The trial court's amended final default judgment awarded Deartis Preston $414,000 and the final judgment awarded Doris's estate $180,716.94 in exemplary damages based on its finding of sufficient clear and convincing evidence. In the trial court's findings of fact and conclusions of law, it found that appellants had breached their fiduciary duties to appellees; that such breaches were committed with an intent to gain benefits and consisted of self-dealing; that

appellants conspired with each other in these breaches; that the torts of civil conspiracy and breach of fiduciary duty supported the awards; and that the awards were justified. Furthermore, the trial court found that there was sufficient evidence under the *Kraus* factors to support the awards by looking to the nature of the wrongful character of the conduct involved, the degree of culpability of the wrongdoers, the situation and sensibilities of the parties concerned, and the extent to which such conduct offends the public's sense of justice and propriety. *See Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981). Additionally, the trial court found such awards were not unconstitutionally excessive and comported with the Texas Civil Practice & Remedies Code. *See id.*; Tex. Civ. Prac. & Rem. Code Ann. § 41.008 (West Supp. 2010); *Kraus*, 616 S.W.2d at 910. And in its conclusions of law, the trial court concluded that it, as the factfinder, could reasonably form a firm belief or conviction that its findings were true.

Furthermore, because the trial court specifically found that both appellants not only committed a breach of their fiduciary duties but also were in a conspiracy to commit these breaches, I believe there is sufficient evidence of their intent to gain unwarranted benefits and engage in self-dealing. *See, e.g.*, *Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 330 S.W.3d 342, 358 (Tex. App.—San Antonio 2010, pet. filed).

2

For all of these reasons, I would affirm the part of the trial court's judgments awarding exemplary damages.


                                        TERRIE LIVINGSTON
                                        CHIEF JUSTICE

DELIVERED:  July 14, 2011