

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-17-00266-CV

———————————————

DALE ROY SLAVEN, Appellant

V.

BRAD LIVINGSTON, WILLIAM STEPHENS, AND LYNN M. CLARK, Appellees

---

On Appeal from the 30th District Court
Wichita County, Texas
Trial Court No. 184,311-A

---

Before Kerr, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Kerr

**MEMORANDUM OPINION**

Inmate Dale Roy Slaven appeals the trial court's summary judgment dismissing his suit against three Texas Department of Criminal Justice (TDCJ) employees—Brad Livingston, William Stephens, and Lynn M. Clark. We reverse and remand as to Slaven's 42 U.S.C. § 1983 claim based on an alleged violation of the due-course-of-law provision of the Texas Constitution—which Livingston, Stephens, and Clark concede that they did not address when moving for summary judgment. But as to all the other claims, we affirm.

In Slaven's "Issues-Presented-for-Review" section of his pro se brief, he lists five issues.[1] *See* Tex. R. App. P. 38.1(f). But in his brief's "Arguments" section, he presents them as three separately enumerated issues: (1) "Issue #1 Argument: The Trial Court was without discretion in granting summary[]judgment"; (2) "Issue

---

[1]He framed his issues as follows:

#1-The Appellees did not prove as a Matter of Law that they were entitled to summary[]judgment as a Matter of Law;

#2-The evidence produced by the Appellees was not Legally or Factually sufficient to support the Trial Court[']s decision;

#3-The Court left Factually disputed issues unresolved;

#4-The Court erred by Misapplying the Law regarding the various Immunities, Defenses, & Exceptions;

#5-The evidence produced by the Appellees in their Motion for Summary[]Judgment proved the opposite of the appellees['] claims[.]

#2 Argument: The Trial Court was without discretion to grant summary[]judgment"; and (3) "Issue #3 Argument: The Trial Court was without discretion granting summary[]judgment by erring in admitting evidence that was not sufficient." *See* Tex. R. App. P. 38.1(i).

## I. Background Generally

Slaven was convicted of 15 offenses in 2010. *Slaven v. State*, No. 02-10-00413-CR, 2012 WL 1964590, at *1 (Tex. App.—Fort Worth May 31, 2012, pet. ref'd) (mem. op., not designated for publication).[2] The trial court assessed court costs at $274 per case for a cumulative total of $4,110. *Slaven v. State*, No. 02-11-00297-CV, 2012 WL 5535603, at *1 (Tex. App.—Fort Worth Nov. 15, 2012, no pet.) (mem. op.).[3] In 2011, the trial court signed orders to withdraw funds in each of the 15 cases. *Id.* But because each order authorized a 10% withdrawal from his inmate account, Slaven complained that they collectively authorized taking 150% of his trust fund deposits, which left nothing for him.

---

[2]The full citation is *Slaven v. State*, Nos. 02-10-00413-CR, 02-10-00414-CR, 02-10-00415-CR, 02-10-00416-CR, 02-10-00417-CR, 02-10-00418-CR, 02-10-00419-CR, 02-10-00420-CR, 02-10-00421-CR, 02-10-00422-CR, 02-10-00423-CR, 02-10-00424-CR, 02-10-00425-CR, 02-10-00426-CR, 02-10-00427-CR, 2012 WL 1964590, at *1 (Tex. App.—Fort Worth May 31, 2012, pet. ref'd) (mem. op., not designated for publication).

[3]The full citation is *Slaven v. State*, Nos. 02-11-00297-CV, 02-11-00298-CV, 02-11-00299-CV, 02-11-00300-CV, 02-11-00301-CV, 02-11-00302-CV, 02-11-00303-CV, 02-11-00304-CV, 02-11-00305-CV, 2012 WL 5535603, at *1 (Tex. App.—Fort Worth Nov. 15, 2012, no pet.) (mem. op.).

In 2011, the trial court heard Slaven's complaints, and in a December 29, 2011 order, it waived court costs in ten of the fifteen cases and, in the remaining five cases, ordered the Institutional Division of the TDCJ "to garnish [Slaven's] Inmate Account for no more than 10% per month, collectively on these five cases, in order to collect the court fees."

Still dissatisfied, Slaven appealed the trial court's December 29, 2011 order to us, but we affirmed, in the process construing the trial court's language to mean that "the Department could . . . cumulatively withdraw no more than ten percent of the funds in Slaven's inmate account per month." *See id.* at *1, 5. We even added a footnote to clarify our construction: "In other words, even though Slaven still must pay court costs for five cases, the total amount of court costs taken from his trust account in any given month cannot exceed ten percent of the account balance." *Id.* at *1 n.4. Driving home the point, we gave an example: "If Slaven's account balance is $15, the Department can withdraw only $1.50 and equally apportion that $1.50 toward the outstanding balance in the five cases." *Id.*

But in practice, Slaven discovered that the Inmate Trust Fund Department construed it differently—the Department was taking 50% of his deposits. Slaven's mother sent him $50 every month, meaning that the Department was taking $25 instead of only $5 each month to pay off his court costs.

Complaining about excessive amounts being withdrawn from his trust account, in 2012 Slaven unsuccessfully sought mandamus relief from us against "the Texas

Department of Criminal Justice, the Tarrant County District Attorney, or the Tarrant County District Clerk." *See In re Slaven*, No. 02-12-00431-CV, 2012 WL 5356297, at *1 (Tex. App.—Fort Worth Nov. 1, 2012, orig. proceeding) (mem. op.).[4]

Slaven then turned to the trust fund for relief, but in 2014, the only answer he received was a hand-written response from "L. Clark": "We Collect 10% per Court order per deposit. You have 5 orders. Any Questions Please Contact the Court."

Contacting the trial court is precisely what Slaven did in 2015. Unlike in 2011 when the trial court granted Slaven some relief, this time the trial court did not. And unlike in 2011—when Slaven appealed the trial court's order because it did not give him all the relief he wanted—this time Slaven did not appeal.

Instead, Slaven sued Brad Livingston, the executive director of the TDCJ; William Stephens, the director of the Institutional Division of the TDCJ; and L. Clark, an employee in the Inmate Trust Fund Department. Slaven sought relief against them in both their official and individual capacities.

Livingston, Stephens, and Clark answered by asserting various immunities, including those contained in the Texas Tort Claims Act, and a general denial. In response to Slaven's petition, the Inmate Trust Fund Department placed a hold on any further withdrawals from Slaven's inmate account pending the litigation. At that

---

[4]Based on the appellate cause numbers, Slaven filed his mandamus petition after filing his appeal attacking the trial court's December 29, 2011 order.

5

time, Slaven's total remaining balance for court costs and fees in all his cases was $42.67.

In his petition, Slaven asserted five causes of action based in part on the disputed 50% withdrawals discussed above and in part—raising a totally new matter—on the delay between the time his mother's bank debited her account and the time the Inmate Trust Fund Department credited his account. Citing Black's Law Dictionary, Slaven contended that the transfers into his account should have occurred within one day instead of the three to nine days that he experienced, and he alleged that Livingston, Stephens, and Clark were using the delay to earn interest on his money.

We summarize Slaven's five causes of actions as follows:

- The first consisted of two 42 U.S.C. § 1983 claims:

  o He based Part A on an alleged due-process violation under the Fourteenth Amendment of the United States Constitution and its Texas equivalent, an alleged due-course-of-law violation under Texas Constitution article I, section 19. Specifically, Slaven asserted that Livingston, Stephens, and Clark were authorized to take only 10% out of his trust fund to pay costs but took, instead, 50%.

  o He alleged in Part B a Takings Clause violation under the Fifth Amendment of the United States Constitution.[5] Here, Slaven asserted that Livingston, Stephens, and Clark held his funds for three to nine days and, in the process, (1) denied him access to his own money and (2) drew interest on his money.

---

[5]Slaven did not rely on the Texas Constitution in Part B.

- Next, Slaven alleged that Livingston, Stephens, and Clark (Clark primarily) converted his funds by withholding 50% of his funds instead of only 10%.

- In his third cause of action, Slaven contended that Clark—again by withholding 50% of his funds—committed theft under section 31.03 of the penal code. *See* Tex. Penal Code Ann. § 31.03. *But see Morris v. Cozby*, No. 11-16-00169-CV, 2018 WL 2749804, at *5 (Tex. App.—Eastland June 7, 2018, no pet.) (mem. op.) (stating that the Texas Penal Code does not create private causes of action). Slaven placed this contention under the heading, "Theft Liability Act." *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 134.001–.005; *Morris*, 2018 WL 2749804, at *5 (stating that persons committing theft are civilly liable under the Texas Theft Liability Act).

- Slaven asserted in his fourth cause of action that Livingston, Stephens, and Clark owed him an "informal" fiduciary duty because they operated the Inmate Trust Fund and violated their fiduciary duty because they held his funds for three to nine days and because they withheld 50% of his money instead of the 10% authorized by the trial court's order.

- Finally, in his fifth cause of action, Slaven sought a declaratory judgment setting out the parameters of Livingston's, Stephens's, and Clark's "informal" fiduciary duties. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001–.011.

Livingston, Stephens, and Clark filed a Chapter 14 motion to dismiss, *see* Tex. Civ. Prac. & Rem. Code Ann. §§ 14.001–.014, alleging that Slaven had failed to comply with the procedures required of an inmate who is proceeding *in forma pauperis*. They later explicitly asked the trial court to "dismiss their previously filed Chapter 14 Motion to Dismiss" and, still later, moved for summary judgment instead. In an affidavit supporting their summary-judgment motion, Terri Hopkins, a manager for the Inmate Trust Fund, stated:

> To prepare for this affidavit, I have reviewed: (1) Mr. Slaven's Inmate Trust Fund ("ITF") account; and (2) the December 29, 2011, Tarrant County court order that authorizes TDCJ to garnish 10% of Mr. Slaven's

monthly ITF account deposits to repay court costs for each of five Tarrant County cases. The December 29, 2011 Tarrant County Order shows that Mr. Slaven owed court costs on five separate criminal cases for a total of $1,370.00. After reviewing . . . Mr. Slaven's ITF account, it shows that a total of $1,315.23 has been withheld since February 18, 2011, and [has been] remitted to Tarrant County. The employees who withheld and remitted the money to Tarrant County acted within the course and scope of their employment with the Texas Department of Criminal Justice.

There has been a hold placed on withdrawals from Mr. Slaven's ITF account for the pendency of this lawsuit. Currently, Mr. Slaven has $42.67 remaining balance on the full amount owed to repay the costs of his five Tarrant County cases.[6]

In the motion itself, Livingston, Stephens, and Clark alleged that Slaven's petition conceded that they were acting under the general scope of their employment as TDCJ administrators.

And although supported by (1) Hopkins's affidavit, (2) the trial court's December 29, 2011 order, and (3) our 2012 *Slaven* judgment and opinion affirming the December 29, 2011 order, substantively Livingston, Stephens, and Clark appeared to have moved for summary judgment on the pleadings—that is, they argued that the

[6]In Slaven's response to Livingston, Stephens, and Clark's motion for summary judgment and in his brief, Slaven attacked Hopkins's supporting affidavit. But Hopkins's affidavit established only what Slaven himself had alleged in his petition—that the Inmate Trust Fund Department construed the trial court's December 29, 2011 order to authorize 10% withdrawals for each of the five remaining cases for a total of 50%. Although Slaven appeared to object to Hopkins's reliance on trust-fund documents because they were not attached to the affidavit, Slaven did not and does not challenge Hopkins's assertion that, based on his review of those documents, Slaven's remaining court-costs-and-fees balance was only $42.67. Slaven confirms in his brief that Hopkins placed a hold on his account preventing any further deductions.

facts Slaven alleged in his petition affirmatively negated his causes of action. *See Perez v. Kirk & Carrigan*, 822 S.W.2d 261, 269 (Tex. App.—Corpus Christi 1992, writ denied). In the argument portion of their motion, they did not rely on any of the attached exhibits but relied instead on Slaven's petition and numerous legal authorities.

The trial court granted Livingston, Stephens, and Clark's motion and ordered Slaven's claims against them dismissed.

## II. Background on the Inmate Trust Fund

Central to Slaven's case is the Inmate Trust Fund. In pertinent part, the government code explains that it exists because inmates may not possess money and that it functions like a checking account. The government code also sets out the parameters for its use—one of which is that the fund may be used to pay court-ordered fees and costs:

> (a) The department shall take possession of all money that an inmate has on the inmate's person or that is received with the inmate when the inmate arrives at a facility to be admitted to the custody of the department and all money the inmate receives at the department during confinement and shall credit the money to an account created for the inmate. The department may spend money from an inmate account on the written order of the inmate in whose name the account is established or as required by law or policy subject to restrictions on the expenditure established by law or policy. The department shall ensure that each facility operated by or under contract with the department shall operate an account system that complies with this section, but the department is not required to operate a separate account system for or at each facility.
>
> . . . .

(e) On notification by a court, the department shall withdraw from an inmate's account any amount the inmate is ordered to pay by order of the court under this subsection. . . . The department shall make a payment under this subsection as ordered by the court to either the court or the party specified in the court order. *The department is not liable for withdrawing or failing to withdraw money or making payments or failing to make payments under this subsection.* The department shall make withdrawals and payments from an inmate's account under this subsection according to the following schedule of priorities:

. . .

(4) as payment in full for all orders for court fees and costs;

. . . .

Tex. Gov't Code Ann. § 501.014(a), (e) (emphasis added).

## III. Standard of Review for Summary Judgment on the Pleadings

### A. Summary judgment on the pleadings is generally—but not always—improper.

A plaintiff may plead facts that affirmatively negate its cause of action or, put another way, a party may plead itself out of court. *Tex. Dep't of Corr. v. Herring*, 513 S.W.2d 6, 9 (Tex. 1974). In general, it is improper to grant summary judgment on a deficient pleading's failure to state a cause of action when the deficiency can be attacked through a special exception. *In re B.I.V.*, 870 S.W.2d 12, 13 (Tex. 1994). But a pleading-deficiency summary judgment may be proper if a party has had an opportunity by special exception to amend and fails to do so or if it files an additional defective pleading. *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex. 1994); *Gallien v. Washington Mut. Home Loans, Inc.*, 209 S.W.3d 856, 866 (Tex. App.—Texarkana 2006, no pet.). If a pleading deficiency cannot be cured by an amendment, summary

10

judgment may also be proper. *Gallien*, 209 S.W.3d at 866. In such a case, we review the pleadings de novo, taking all allegations, facts, and inferences in the pleadings as true and viewing them in a light most favorable to the pleader. *Natividad*, 875 S.W.2d at 699.

**B. Slaven waives any complaints that (1) his petition was being improperly attacked by summary judgment instead of by special exceptions and (2) he was not given an opportunity to amend his petition.**

In Slaven's July 10, 2017 response to Livingston, Stephens, and Clark's motion for summary judgment, he neither objected on the basis that special exceptions were the proper means to attack his petition nor sought leave to amend his petition. Only after the trial court signed the order granting summary judgment did Slaven move for leave to amend. To the extent he argued post-judgment and now argues in his appellate brief that he should have been given leave to amend, he waived that complaint. *See Perkins v. Hicks*, No. 02-17-00227-CV, 2018 WL 3968489, at *3 (Tex. App.—Fort Worth Aug. 16, 2018, no pet.) (mem. op.).

## IV. Discussion of Summary Judgment on Slaven's Causes of Action

Slaven pleaded five causes of action, the first of which had two components. We address each of his claims in turn.

**A. Section 1983 claims must be based on violations of the United States Constitution or federal law.**

In pertinent part, 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any

11

citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983. "Section 1983 creates a private right of action to vindicate violations of rights, privileges, and immunities secured by the Constitution and laws of the United States." *Heirs of Del Real v. Eason*, 374 S.W.3d 483, 486 (Tex. App.—Eastland 2012, no pet.); *Reece v. Johnson*, No. 10-12-00077-CV, 2013 WL 4511930, at *2 (Tex. App.—Waco Aug. 22, 2013, no pet.) (mem. op.). A cause of action under 42 U.S.C. § 1983 involves two essential elements: (1) a person acting under color of state law must have committed the complained-of conduct, and (2) the conduct deprived a person of rights, privileges, or immunities secured by the Constitution or the laws of the United States. *Cty. of El Paso v. Dorado*, 180 S.W.3d 854, 862 (Tex. App.—El Paso 2005, pet. denied). A § 1983 claim must be based on violations of the United States Constitution or federal law, not on violations of a state constitution or state law. *See Reece*, 2013 WL 4511930, at *2.

**1. We treat separately Slaven's § 1983 claims based on state due-course-of-law and federal due-process contentions.**

    **a. Because Livingston, Stephens, and Clark did not move for summary judgment on Slaven's § 1983 claim based on alleged due-course-of-law violations under the Texas Constitution, we reverse that portion of the judgment.**

Livingston, Stephens, and Clark acknowledge that their summary-judgment motion did not address Slaven's § 1983 claims brought under the due-course-of-law

12

provision of section 19 of article I of the Texas Constitution and ask that those claims should therefore be remanded to the trial court. We agree. We cannot affirm a summary judgment on grounds not expressly set out in the motion or response. *See Stiles v. Resolution Trust Corp.*, 867 S.W.2d 24, 26 (Tex. 1993).

### b. As a matter of law, Slaven cannot recover on his § 1983 claim based on alleged due-process violations under the United States Constitution.

In their motion, Livingston, Stephens, and Clark relied on a United States Supreme Court and a federal-district-court opinion for the proposition that they were entitled to summary judgment on any of Slaven's 42 U.S.C. § 1983 claims that were based on alleged due-process violations under the Fourteenth Amendment. *See Hudson v. Palmer*, 468 U.S. 517, 533, 104 S. Ct. 3194, 3204 (1984); *Kothmann v. Thaler*, No. 3-10-CV-1306-B, 2010 WL 4063168, at *2 (N.D. Tex. Sept. 17, 2010). We agree.

Slaven alleged that Livingston, Stephens, and Clark acted intentionally and deliberately when withholding 50% of his trust funds.

But the Supreme Court has held that "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson*, 468 U.S. at 533, 104 S. Ct. at 3204. More recently, a federal district court mirrored that assessment: "The intentional deprivation of property by prison officials does not give rise to a federal[-]civil[-]rights claim unless the inmate can show that state remedies are

13

inadequate." *Kothmann*, 2010 WL 4063168, at *2. And for Texas prisons specifically, the court wrote, "Texas provides an adequate post-deprivation remedy to prisoners by way of a common law action for conversion . . . ." *Id.*

Similarly, because Texas provides such adequate remedies, the Eastland Court of Appeals has held that a prison official who either negligently or intentionally deprives an inmate of property does not violate the Due Process Clause. *Morris*, 2018 WL 2749804, at *5 (citing *Aguilar v. Chastain*, 923 S.W.2d 740, 743–44 (Tex. App.—Tyler 1996, writ denied)).

Slaven acknowledges that he has availed himself of both administrative and trial-court review. "The Constitution requires due process; it does not require error-free decision making." *Leachman v. Stephens*, No. 02-13-00357-CV, 2016 WL 6648747, at *27 (Tex. App.—Fort Worth Nov. 10, 2016, pet. denied) (mem. op.), *cert. denied*, 138 S. Ct. 1550 (2018). Although Slaven's attempts to resolve his dispute administratively failed, and although his 2015 suit in the trial court did not procure for him the relief he sought, Slaven never appealed the trial court's ruling. Because Slaven did not exhaust his postdeprivation remedies, he cannot show that they were inadequate. *See generally Olivarez v. Tex. Dep't of Criminal Justice Corr. Insts. Div.*, No. 14-12-00953-CV, 2014 WL 1267072, at *1–2 (Tex. App.—Houston [14th Dist.] Mar. 27, 2014, no pet.) (mem. op.).

**2. The trial court properly granted summary judgment on Slaven's 42 U.S.C. § 1983 claims based on alleged Takings Clause violations.**

Slaven's petition asserted that the debits from his mother's account occurred on the fifth of each month but the funds were not made available to him until the eighth or fourteenth of each month, that is, not until three to nine days later. He also asserted that Livingston, Stephens, and Clark were drawing interest on his money while denying him the use of it and, in doing so, were violating the Takings Clause of the United States Constitution. *See* U.S. Const. amend. V.

The Takings Clause consists of several elements: (1) the action complained of must be a governmental one; (2) the action must amount to a taking; (3) the thing taken must be "private property," that is, it must be a right included in the owner's "bundle" of property rights; and (4) the taking must be for a "public" use. *GTE Sw. Inc. v. Pub. Util. Comm'n of Tex.*, 10 S.W.3d 7, 11 (Tex. App.—Austin 1999, no pet.).

Asserting that Slaven had made "bald allegations and conclusionary statements" and that he had failed to assert a claim that was "plausible on its face," Livingston, Stephens, and Clark moved for summary judgment on Slaven's Takings Clause claim. They asserted that Slaven failed to show the essential elements of a takings claim, arguing that Slaven had not shown that (1) processing a deposit amounts to a taking, (2) either the delay or the interest amounted to a protectable property interest, and (3) any alleged taking was for public use. We agree.

### a. Slaven questions the delays in crediting his account.

To his response to the summary-judgment motion, Slaven attached his mother's affidavit showing that the debits occur on the fifth of each month. In his unsworn declaration, Slaven stated that the money was never disbursed before the eighth of the month and, in some instances, not until the fourteenth. In Slaven's summary-judgment response, he asserted that it was "reasonable to assume" that the money was earning interest.

In Slaven's petition, he referred to Exhibit I, which consisted of two documents: (1) "Authorization Agreement for Automatic Deposits (ACH Credits) to an Inmate Account" (the authorization agreement) and (2) "Texas Department of Criminal Justice – Inmate Trust Fund Department / Current Inmate Trust Fund Deposit Options" (the options form). He next stated that "ACH" stood for "Automated Clearing House," and—citing "Black Law Dictionary, Abridged 6th ed." but not providing a copy—he asserted that an automated clearing house is defined as "[a] collection of regional electronic interbank networks used to process transactions electronically with a guaranteed one-day bank collection float."[7] In responding to the summary-judgment motion, Slaven again relied on Black's Law Dictionary for the

---

[7]NASDAQ defines "collection float" as "[t]he period between the time . . . a check is deposited in an account and the time funds are made available." NASDAQ, https://www.nasdaq.com/investing/glossary/c/collection-float (last visited Feb. 15, 2019).

proposition that, "by definition," an automated clearing house guarantees a one-day "bank collection float."

### b. The Fifth Circuit has already addressed and rejected Slaven's interest argument.

The Fifth Circuit Court of Appeals has addressed Slaven's Takings Clause argument and held that Texas inmates—by voluntarily participating in the inmate account—knowingly waive any right to any interest. *See Hatfield v. Scott*, 306 F.3d 223, 228–30 (5th Cir. 2002). Indeed, Slaven admitted in his petition that the inmate account is a non-interest-earning account.[8]

We have held that "[a]dmissions in trial pleadings are judicial admissions in the case in which the pleadings are filed; the facts judicially admitted require no proof and preclude the introduction of evidence to the contrary." *In re A.E.A.*, 406 S.W.3d 404, 410 (Tex. App.—Fort Worth 2013, no pet.). This rule is "based on the public policy

---

[8]The options form that Slaven provided is silent on whether inmates earn interest. But another version of the options form that we found on-line expressly states that "[o]ffenders do not earn interest on funds in their account." Texas Department of Criminal Justice—Inmate Trust Fund, http://www.tdcj.texas.gov/documents/bfd/Deposit_Options_Flyer.pdf (last visited Feb. 15, 2019). And the TDCJ "Offender Orientation Handbook" states: "The Inmate Trust Fund does not pay interest. Therefore, the account should hold no more than what is required to meet the offender's immediate needs. Offenders with excess funds are encouraged to open a savings account with a banking facility of their choice." Offender Orientation Handbook—Texas Department of Criminal Justice, http://www.tdcj.state.tx.us/documents/Offender_Orientation_Handbook_English.pdf p. 66 (last visited Feb. 15, 2019).

that it would be absurd and manifestly unjust to permit a party to recover after he has sworn himself out of court by a clear and unequivocal statement." *Id.*

Because Slaven abandoned any right to interest, he has no Takings Clause claim to it.[9] *See Hatfield*, 306 F.3d at 226–30.

### c. Because any delays result from the ACH system, Slaven cannot show a Takings Clause violation.

In the trial court, and also to us, Slaven complains about the delay from the time the money is debited from his mother's account until the time it is credited to his trust account, during which time he does not have access to his money. (This differs from a claim that he was entitled to receive interest.) Slaven asserts that there should be only a one-day "guaranteed" float between the time the money is debited from his mother's account and credited to his trust account. To us, Slaven is implying that if the money does not post to his inmate account within one day, there must be a reason, and he suggests that the reason is that the money is drawing interest during the delay. In his response to the summary-judgment motion, Slaven asserted:

---

[9]Slaven is correct to the extent he asserts that the trust fund itself earns interest. As the Fifth Circuit has explained:

> The inmate trust fund was established under TDCJ Administrative Directive 14.62, as authorized under Tex. Gov't Code § 501.014. Under the terms of the fund, interest accruing to the fund is used to offset the cost of maintaining the consolidated accounts. If excess interest is earned above the cost of maintenance, it is invested in United States Treasury bills and any interest earned is appropriated to TDCJ to partially fund the cost to operate the Inmate Trust Fund Department.

*Hatfield*, 306 F.3d at 224–25.

18

After the funds accumulated by the ITF are held for a period, they are disbursed between the 8th day & 14th day of the month It is reasonable to assume that during this 3[-] to 9[-]day period in which the ITF has care, custody, & control over the funds, it is drawing interest on those funds. The larger the amount of funds that are accumulated by the ITF, the more advantageous the interest rate.

The linchpin to Slaven's argument is his assertion that he is entitled to his money within one day after it is debited from his mother's account. But Slaven provides no authority to show that the ACH system has any one-day "guaranteed" processing time from which he has a right to benefit.

First, "Black's Law Dictionary, Abridged 6th ed."—which was Slaven's sole purported authority in the trial court—is not the law; it is a dictionary. *Cf. Campbell Paint & Varnish Co. v. Ladd Furniture & Carpet Co.*, 83 S.W.2d 1095, 1097 (Tex. Civ. App.—Fort Worth 1935, writ dism'd) ("Dictionaries are supposed to record meanings already established for words. Whether a particular dictionary does so with reference to a particular word is a question which scholars have found rich field for controversy, sometimes acrid.") Moreover, the current version of Black's Law Dictionary does not contain an entry for "ACH" or "Automated Clearing House." It does define "clearinghouse," but its definition does not match Slaven's. *Clearinghouse* Black's Law Dictionary (10th ed. 2014).

Second, Slaven's own documents—the "Authorization Agreement for Automatic Deposits (ACH[10] Credits) to an Inmate Account" and the options form titled "Monthly Checking Account Debit (ACH)"—undercut the idea of a guaranteed one-day turnaround. Although the authorization agreement states that the debit will occur "on or around" the fifth of each month and the options form provides that the debit will occur "on" the fifth of each month, neither document indicates when the funds will be credited to the inmate's account.[11] The options form does list various other means to transfer money into an inmate's account; for a fee, if Slaven's mother had chosen Western Union Quick Collect, her deposit made using that method would "post to offender's account within 24 hours." So the options form itself identifies a means by which transfers can be completed within one day, but an ACH transfer was not it.

Even though Slaven rightly notes that deposits into the Inmate Trust Fund are made through an automated clearing house, nothing requires an ACH transaction to

---

[10]We note that "ACH" seems universally to mean "Automated Clearing House," regardless of its absence from the current Black's Law Dictionary. *See, e.g., Martinez v. State*, No. 08-13-00363-CR, 2016 WL 2864952, at *5 (Tex. App.—El Paso May 13, 2016, no pet.) (not designated for publication) (referring without comment to "voluminous Automated Clearing House (ACH) records" and to funds electronically transferred "by an automated clearing house (ACH)").

[11]Another version of the options form provides: "To have a set amount automatically debited from a personal checking account once each month for deposit to a specified offender. Debit transaction will occur *on or around the 5th* day of each month and credit to the Offender's account *on or around the 10th*." Texas Department of Criminal Justice—Inmate Trust Fund, http://www.tdcj.texas.gov/documents/bfd/Deposit_Options_Flyer.pdf (last visited Feb. 19, 2019).

be processed within one day. Slaven cannot show that processing a deposit amounts to a governmental taking, that the delay or the interest amounted to a protectable property interest, or that any alleged taking was for public use.

**B. Slaven's three tort claims are subject to the Texas Tort Claims Act, and thus the trial court properly dismissed Slaven's tort claims against Livingston, Stephens, and Clark.**

Slaven's next three causes of action—conversion, theft, and breach of fiduciary duty—are all torts. *See Robinson v. Scott*, No. 10-16-00158-CV, 2018 WL 1097469, at *2 (Tex. App.—Waco Feb. 28, 2018, no pet.) (mem. op.) (conversion; theft); *In re Estate of Preston*, 346 S.W.3d 137, 170 (Tex. App.—Fort Worth 2011, no pet.) (breach of fiduciary duty).

Asserting immunity from Slaven's tort claims under section 101.106 of the Texas Tort Claims Act (TTCA), Livingston, Stephens, and Clark moved for summary judgment. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.106.

When a plaintiff alleges a tort against a governmental unit or its employees, the plaintiff must elect whether to sue the governmental unit or its employees; suing one irrevocably bars suit against the other. *Id.* § 101.106(a), (b). If a plaintiff sues both the governmental unit and any of its employees (which is not what Slaven did), on the governmental unit's motion its employees can be dismissed immediately. *Id.* § 101.106(e). But when the plaintiff chooses to sue only the employees, those employees—if they can meet section 101.106(f)'s requirements—can force the

plaintiff to dismiss its suit against them and to file an amended petition against the governmental unit. *Id.* § 101.106(f). The relevant portions of the statute appear below:

§ 101.106 Election of Remedies

(a) The filing of a suit under this chapter against a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars any suit or recovery by the plaintiff against any individual employee of the governmental unit regarding the same subject matter.

(b) The filing of a suit against any employee of a governmental unit constitutes an irrevocable election by the plaintiff and immediately and forever bars any suit or recovery by the plaintiff against the governmental unit regarding the same subject matter unless the governmental unit consents.

. . . .

(e) If a suit is filed under this chapter against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit.

(f) If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only. On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

*Id.* § 101.106(a), (b), (e), (f).

This election-of-remedies provision is "intended to 'force a plaintiff to decide at the outset whether an employee acted independently and is thus solely liable, or acted within the general scope of his or her employment such that the governmental unit is vicariously liable.'" *Laverie v. Wetherbe*, 517 S.W.3d 748, 752 (Tex. 2017) (quoting

22

*Mission Consol. ISD v. Garcia*, 253 S.W.3d 653, 657 (Tex. 2008)). The provision compels "the expedient dismissal of governmental employees when suit should have been brought against the government." *Tex. Adjutant Gen.'s Office v. Ngakoue*, 408 S.W.3d 350, 355 (Tex. 2013). This legislative mandate is meant to "'reduc[e] the resources that the government and its employees must use in defending redundant litigation and alternative theories of recovery.'" *Alexander v. Walker*, 435 S.W.3d 789, 790 (Tex. 2014) (quoting *Garcia*, 253 S.W.3d at 657).

Here, Slaven sued government employees—Livingston, Stephens, and Clark—and those employees invoked section 101.106(f)'s protections. Under subsection (f), a defendant is entitled to a dismissal on proof that the plaintiff's suit (1) was based on conduct within the scope of the defendant's employment with a governmental unit and (2) could have been brought against the governmental unit under the TTCA. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.106(f); *Anderson v. Bessman,* 365 S.W.3d 119, 124 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *Franka v Velasquez,* 332 S.W.3d 367, 369 (Tex. 2011)). The first component encompasses two questions. First, was the defendant an employee of a governmental unit? And second, do the alleged acts fall within the scope of that employment at the relevant time? *Anderson*, 365 S.W.3d at 124. The statute strongly favors dismissing governmental employees. *Id.*

In his petition, Slaven identifies all three defendants as working for the TDCJ, thus conceding that all three were employees of a governmental unit. *See Franka*, 332 S.W.3d at 372.

As for the second question, the TTCA defines "scope of employment" as "the performance for a governmental unit of the duties of an employee's office or employment and includes being in and about the performance of a task lawfully assigned to an employee by competent authority." Tex. Civ. Prac. & Rem. Code Ann. § 101.001(5). And "public officials act within the scope of their authority if they are discharging the duties generally assigned to them." *Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 424 (Tex. 2004). "That is, an employee's scope of authority extends to job duties to which the official has been assigned, even if the official errs in completing the task." *Lopez v. Serna*, 414 S.W.3d 890, 894 (Tex. App.—San Antonio 2013, no pet.).

In their motion, Livingston, Stephens, and Clark alleged that Slaven's petition conceded they were acting under the general scope of their employment as TDCJ administrators. The act about which Slaven complains is Livingston's, Stephens's, and Clark's interpretation of the December 29, 2011 order as authorizing 50% withdrawals instead of 10% withdrawals. Even if they were incorrect, this decision falls within the scope of their employment. *See Ballantyne*, 144 S.W.3d at 424; *Lopez*, 414 S.W.3d at 894.

The only remaining question is whether Slaven could have brought his claims against the government itself. "Under Texas law, a suit against a government employee in his official capacity is a suit against his government employer . . . ." *Franka*, 332 S.W.3d at 382. For section 101.106 purposes, any tort claim against the

24

government falls under the TTCA. *Id.* at 375. This is true even when the TTCA does not waive immunity. *Id.* at 375, 379–80, 385. Because Slaven's tort claims arose from the scope of Livingston's, Stephens's, and Clark's employment, the defendant employees properly invoked subsection (f). *See id.* at 381.

The only exception to this rule is if the employee acted ultra vires. *Id.* at 382. Slaven appears to argue that the ultra vires exception applies because Livingston, Stephens, and primarily Clark allegedly acted outside the scope of their authority by interpreting the trial court's December 29, 2011 order in a manner inconsistent with our opinion construing it to mean that the maximum withdrawal was 10% total. *See id.* at 382–83; *Slaven*, 2012 WL 5535603, at *1. But the record does not show an ultra vires act. To fall within this exception, a plaintiff must not attack a governmental officer's exercise of discretion but must, instead, allege and ultimately prove that the officer acted without legal authority or failed to perform a purely ministerial act. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009).

As an overarching matter, the only way Livingston, Stephens, and Clark become embroiled in this dispute is through the Inmate Trust Fund. Although in his petition Slaven speculated that the three might be "unjustly enriching themselves and/or the State" with interest off his trust account, he acknowledged in his summary-judgment response that he was aware that the "funds" or interest from the inmate account were used to defray the costs of maintaining and administering the trust fund. Everything in the record shows that Livingston, Stephens, and Clark were

25

administering the trust fund and that Slaven's dispute is with how they were doing it. "Certainly, public officials may err in the performance of their duties." *Ballantyne*, 144 S.W.3d at 424; *see Lopez*, 414 S.W.3d at 894. The government code appears to anticipate mistakes when administering the Inmate Trust Fund. *See* Tex. Gov't Code Ann. § 501.014(e). At best, Slaven has shown that they acted erroneously, not that they acted ultra vires, something that is quite different.

### C. Slaven does not attack the trial court's declaratory-judgment ruling on appeal.

In Slaven's fifth cause of action, he sought a declaratory judgment. In their summary-judgment motion, Livingston, Stephens, and Clark argued that the Eleventh Amendment barred Slaven from getting such relief. U.S. Const. amend. XI. In Slaven's brief to us, although he acknowledges this argument when describing what happened in the trial court, he never challenges the trial court's ruling. We hold that Slaven does not contest the trial court's summary judgment disposing of this claim. *See Bankhead v. Maddox*, 135 S.W.3d 162, 163–64 (Tex. App.—Tyler 2004, no pet.) ("In its review of a civil matter, an appellate court has no discretion to fabricate an issue not raised in the appellant's brief . . . .").

## V. Conclusion

We reverse the summary judgment only to the extent it dismissed Slaven's 42 U.S.C. § 1983 claim based on the alleged violation under Texas Constitution article

I, section 19. We otherwise affirm the trial court's summary judgment on all other claims.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: February 28, 2019